SADYE GREENBERG, Plaintiff, *v.* THE CITY OF NEW YORK and Others, Defendants.

Supreme Court, New York County, June 28, 1934.

*Henry Breckinridge* [*Charles B. Brophy* and *M. Bernard Green-berg* of counsel], for the plaintiff.

*Paul Windels, Corporation Counsel* [*Joseph L. Weiner, William E. C. Mayer* and *Oscar S. Cox* of counsel], for the defendant city.

*Cotton, Franklin, Wright & Gordon* [*Boykin C. Wright, James A. Fowler, Jr., John T. Cahill* and *Paul W. Williams* of counsel], for the defendants New York City Omnibus Corporation and Madison Avenue Coach Company, Inc.

*Jacob I. Goodstein [Charles H. Tuttle, Jacob I. Goodstein and Isidore Zamore* of counsel], for the defendants Comprehensive Omnibus Corporation and East Side Omnibus Corporation.

*Seibert & Riggs [Royal E. T. Riggs* and *H. Preston Coursen* of counsel], for the defendant Fifth Avenue Coach Company.

McCooK, J. This is a taxpayer's action against the city of New York, the members of its board of estimate and apportionment and five other defendants, New York City Omnibus Corporation, Madison Avenue Coach Company, Inc., Comprehensive Omnibus Corporation, Fifth Avenue Coach Company and East Side Omnibus Corporation.*

The history of street transportation in New York explains many features of the litigation before the court. The record of legislative dealings, State and municipal, with the steam roads, the elevated railways, the subways and the surface lines, is replete with charges of failure to regard the interests of the public where great projects of this kind were seeking the aid of laws or franchises. The measures proposed have been, almost always, attacked as improvident, and sometimes as corrupt. Various unsavory episodes left their mark on the statute books and, more particularly, in the charter of the Greater City of New York. Public suspicion of scandal has long been acute in this field; odor and memory have close associations.

While the subways were developing in favor and scope, first supplementing, then measurably replacing the elevated trains, a revolution had been going on in surface transportation. Long before the day of modern depression problems, the trolley system of individual cars on rigid rights of way was suffering from the competition of the other two faster means of conveyance. Financial troubles came and receiverships began to multiply. One has only to examine old newspaper files or legislative documents to learn how seriously political and personal recriminations interfered with calm consideration of surface line problems at this stage. (See, for example, the classic exchange between the mayor and the president of the borough of Manhattan, 42 N. Y. Leg. Docs. [1920], No. 141, at p. 1315.) The arrival of automobiles introduced new competition in the form of motorized buses capable of moving faster and traveling on any part of the highway. The doom of the surface rail car was plain; it was only a matter of time before the unequal struggle should end in the complete disappearance of rails and trolleys. The cars would have been out and the buses

---

* For convenience, these bus-operating defendants are termed Omnibus, Madison, Comprehensive, Fifth Avenue and East Side, respectively.

in long ago but for the practical difficulties presented by an unhappy political heritage, a huge financial stake, and the strong legal position of the owners of the old systems. Moreover, the city faced the requirement of a five-cent fare for subway, elevated and trolley alike.

One bus line had already achieved great success. though at a ten-cent fare, and had early obtained a valuable franchise: in addition to the perpetual rights of the New York railways (trolley) the city was confronted with the perpetual rights of the Fifth Avenue Coach Company (motor bus).* The congestion became worse day by day, and failed to yield to any plan of traffic control. The worst obstacle to progress was and continued to be the anachronism of the surface car and the surface rail.

The depression of 1929 complicated the problem still further. Financial inadequacy and political complications killed the Equitable enterprise, and until the administration which had sponsored it came to an end, no more could be accomplished. For the moment the motorization of surface transportation was checked; yet every informed person knew that was the only way out.

During the Hylan and Walker administrations a popular demand for buses at a five-cent fare was met by the incursion of independent owners and groups of owners, covering cross-town routes and short hauls. Some of these were recognized by the city authorities, at first without warrant and indeed contrary to law. One of the groups was the Green Bus lines, later given regularity by license for one year. The lawless and chaotic conditions are reflected in the court decisions of the period.

It remained for the brief O'Brien administration to bring the matter once more to a head and carry it through the stages of negotiation, preliminary and final hearings, approval of a series of franchises comprehensive in scope, and execution of contracts. The last steps were taken after an election which resulted in the defeat of Mr. O'Brien by Mr. LaGuardia, so that the present board of estimate and apportionment is, as a whole and in spite of the presence of three members of former administrations, of a different political complexion from any of its predecessors since Mitchel. Of the members whose official acts in 1933 are here challenged, a comptroller, Mr. McAneny, was president of the borough of Manhattan with Gaynor, and aldermanic president with Mitchel, Mr. O'Brien had himself been corporation counsel with Hylan, and the presidents of Manhattan and Queens, Messrs. Levy and Harvey, occupied the same positions with Walker.

* The Fifth Avenue franchise, extended in 1900, was established by a unanimous decision of the Court of Appeals in *City of New York* v. *Fifth Avenue Coach Company* (262 N. Y. 481). (May 23, 1933.)

In October, 1933, Sadye Greenberg brought a taxpayer's action, on a complaint similar to the present one, to enjoin the members of the board of estimate from granting the proposed franchises. A justice of this court denied the motion for a temporary injunction as premature, and dismissed the complaint for insufficiency, but with leave to institute a new action in the event the board granted the proposed franchises (149 Misc. 866).* When the franchises were granted late in December, 1933, a new complaint was served, and the bus defendants pleaded over. The city, which had been made a codefendant, at first took a neutral position. However, after the case was set down for trial, the corporation counsel (an appointee of the new mayor) served an answer containing what purports to be a counterclaim against the bus defendants. Besides joining the plaintiff in her position on most important points, the city now for the first time alleged that the city had, by resolutions of the LaGuardia board, asserted the invalidity of the franchises granted in December, 1933, by its predecessors, and asked the court for a declaration of their invalidity, with resulting revocation. The net result of the pleadings is that the city joins plaintiff in praying that the franchise grants be declared null and void. The bus defendants, by appropriate denials, raise the issue on all points later discussed, against both plaintiff and the city.

This case raises three main questions of law, revocation, sufficiency of the inquiry and validity of the vote. Any one of them, if decided in favor of the position taken by the plaintiff and the city, is sufficient to defeat the franchises, and the same would be true as to several other issues. For this reason, and because these are serious questions, they are taken up in detail. The authorities on the subjects, the history and development of the statutes involved and the background and facts of this litigation have been exhaustively discussed in the five main and five answering briefs submitted by the parties, in addition to voluminous memoranda handed up during the trial.

The city stresses the importance of its argument on revocation. The contention is that no franchise can be valid without the consent of the city, and that the city has effectively revoked its consent to the franchises. The counterclaim of the city referred to above has its inception in the resolution adopted on January 26, 1934, which reads:

" Resolved, That the Corporation Counsel be instructed to appear for the City and join in the trial of the action instituted by Sadye Greenberg, a taxpayer, for relief by having declared invalid the

---

* Both orders were affirmed by the Appellate Division (240 App. Div. 970).

franchises granted New York City Omnibus Corporation, Comprehensive Omnibus Corporation, Madison Avenue Coach Company, Inc., and Fifth Avenue Coach Company."*

This resolution does not state, nor in and of itself indicate, that revocation is sought. If it be the intention of a party to rescind a contract, or the purpose of an offeror to withdraw his offer, that intention can and should be stated clearly and exactly. The resolution amounts merely to an instruction to the corporation counsel to appear and " join " in the trial of an action already begun by a taxpayer. The import is that he should take a position similar to the plaintiff. To this very date the board of estimate has failed to pass any additional resolution.

Let us assume, however, that this resolution of January twenty-sixth is in form a revocation. Was the city or the board of estimate empowered to nullify the contracts of December 22 and December 29, 1933? The fundamental principles are well established. In the granting of a franchise the city acts as a representative of the State; the legislative authority which is exercised is that of the State and not of the municipality. (See *City of New York* v. *Bryan*, 196 N. Y. 158, at p. 165, and *People ex rel. City of New York* v. *N. Y. R. Co.*, 217 id. 310, at p. 318.)

The Legislature may dispense with consents or select any agency to give these consents, with the exception of consents to operate street railroads within the limits of the city, which by the constitutional amendment of 1875 may not be granted by the Legislature without the approval of the local authorities. (*Wilcox* v. *McClellan*, 185 N. Y. 9.) From the cases just cited it is clear that the Legislature may delegate its franchise-granting power to a legislative board of the municipality. In fact the Legislature of the State of New York did precisely that. When the board of estimate, acting as agent of a sovereign State, granted a franchise, that franchise was complete. Whether the grantee was required by statute or otherwise to obtain assents or consents did not affect the granting of the franchise as such. " The assent was not a part of the franchise." (*People ex rel. City of New York* v. *N. Y. R. Co., supra.*)

At the present time no one may operate an omnibus upon the streets of the city of New York unless he obtains both a franchise from the board of estimate and a certificate of convenience and necessity from the transit commission. Certain statutes provide for the granting of franchises and others regulate the conditions under which a certificate of convenience and necessity may be

---

* The resolution did not include the East Side.

obtained. The position of the city of New York is that "until a certificate of convenience and necessity has been obtained by the grantee, the right obtained from the city has not vested, but is a mere license which the city may and did revoke." In support of this contention it relies strongly upon *People ex rel. Village of Chateaugay* v. *P. S. Comm.* (255 N. Y. 232). The board of trustees of the village had in 1899 adopted a resolution granting a petition by one Smith that he be permitted to place poles and wires in the streets, and he undertook to supply light at designated rates as consideration for granting this permit. Nothing whatsoever was done by Smith. In 1927 (twenty-eight years later) Smith's executors assigned his rights, and the assignee applied to the Public Service Commission for a certificate. The court very properly held, by reason of the fact that nothing had been done by the grantee for all those years, either in the fulfillment of its contract or the use of its franchise, that the village had sufficient grounds for revoking. The grantee had broken his contract, and the principles to be applied did not differ from the principles of breach of an ordinary contract (p. 241).

It must be borne in mind that in the *Chateaugay* case there was no attack on the *legality* of the original grant of the franchise. The question centered about the *failure to exercise* the grant. No such abandonment, of course, is here alleged, and there is a great difference between acceptance of abandonment after thirty years of non-user and revocation after thirty days. In the former event the right lapses, from non-user or breach of condition subsequent. In the case at bar no revocation for breach of a condition subsequent is alleged. The contracts contain provisions (in substance) that the grantees must apply for certificates of convenience and necessity to the transit commission within a certain specified time, and the grantees, in fact, made such application. The contracts further contain provisions for their termination, if the grantees do not obtain the certificates within the time stated.

The act of the transit commission in granting the certificate of convenience and necessity is altogether different in its nature from that of the board of estimate in granting the franchise. What the board of estimate does is not subject to any review or appeal; it is a true legislative act. Not so the action of the transit commission, which exercises certain police powers on behalf of the State in addition to quasi-judicial functions and, in granting or denying a certificate of convenience and necessity, is subject to judicial review by the court on certiorari. (See *Matter of City of Long Beach* v. *P. S. Comm.*, 249 N. Y. 480; *Matter of Richmond Railways, Inc.*, v. *Gilchrist*, 225 App. Div. 371.)

The city's position, that the right was inchoate at best until the grant of a certificate of convenience and necessity, is unsound. The State Legislature specifically delegated to the board of estimate the power to grant bus franchises. (See, Charter, § 72 *et seq.;* also Charter, § 1458 [Amendments of 1913 and 1925]. " Stage and omnibus routes forbidden until franchise obtained:" " No stage or omnibus route or routes for public use, or any alteration or extension thereof, or any alteration or extension of any existing stage or omnibus route * * * shall hereafter be put in operation in or upon any street, avenue, park, parkway, bridge or public ground within the city of New York until and unless a franchise or right therefor shall be obtained from the board of estimate and apportionment in like manner as, and subject to the limitations and conditions relating to, franchises or rights in this charter provided and imposed." )

No one, to be sure, is privileged to operate a bus on the streets of New York (and in that sense the right is " incomplete and inchoate ") until the transit commission acts. But the grant of a franchise by the franchise-granting authority is complete when that franchise-granting authority has acted pursuant to the charter. It is not a mere license which the State, through its agent, the city, may revoke. The requirement of a certificate of convenience and necessity, to be granted by the transit commission as a prerequisite of operation, does not degrade the grant to the status of a license. On the contrary, it is a right, real and vested.

In the leading case of *Blanshard* v. *City of New York* (262 N. Y. 5, at p. 10) Judge CRANE cites two cases — *People* v. *O'Brien* (111 N. Y. 1) and *Ghee* v. *Northern Union Gas Co.* (158 id. 510).

In *People* v. *O'Brien* the common council of the city of New York had by resolution granted its " consent " to the Broadway Surface Railway Company. The grant was accepted and complied with. Two years thereafter the company was dissolved by the Legislature. An action was then brought by the Attorney-General to obtain a judgment declaratory of the rights and liabilities of the several parties. The question before the court was whether the franchise was property which survived the dissolution of the corporation. It held *that the franchise survived the dissolution.* (See pp. 38, 40.)

In the *Ghee Case (supra),* referred to by Judge CRANE, the court had before it the question of determining whether the municipal assembly of the city of New York or certain administrative boards were empowered to grant a franchise to a gas lighting corporation to use the city's streets. Answering the argument that " municipal

authorities should be construed as meaning certain administrative boards rather than the Municipal Assembly," the court said (at p. 513): " At the threshold of the consideration of these questions, it will be well to have in mind the legal effect of the consent which the municipal authorities are authorized to give by the Transportation Corporations Act. It operates to create a franchise by which is vested in the corporation receiving it a perpetual and indefeasible interest in the land constituting the streets of a municipality."

The court accordingly there holds that the municipal assembly is the franchise-conferring authority. It expressly states (which completely answers the contention of the city in our case) that the permission to exercise such rights forms no part of the franchise and is not essential to its existence. It need not be pointed out that there is a striking similarity between a requirement that a gas company apply for a permit of public convenience to exercise its franchise rights and a requirement that the grantee of a bus franchise apply to the transit commission for a permit to exercise the right to operate. The creation of the franchise in each instance was complete and indefeasible when the municipal authorities had acted (pp. 524, 525).

That application must subsequently be made to another body, before the grant may be exercised, in no way diminishes the completeness of the grant. It is merely a condition subsequent, sufficient compliance with which must be passed upon by an administrative body whose determinations are subject to review.

The corporation counsel relies on *Bohl* v. *City of Schenectady* (128 Misc. 863), where a temporary injunction was sought to restrain the city from interfering with the plaintiff's operation of motor bus lines. A temporary injunction was issued. The city had granted its consent and, in reliance thereon, the grantee obtained from the Public Service Commission a certificate of public convenience and necessity and actually commenced operation and incurred large expenditures for motor buses and land. Thereafter the common council of the city adopted an ordinance rescinding and repealing the former ordinance which authorized the operation of the bus lines. The court there said (at p. 867): " Conceding that at the time of the adoption of the ordinance the consent of the city was but a mere revocable license, it became irrevocable through the expenditure of money by Coons and by the plaintiffs." (Citations.)

Further reading, however, discloses that it was " an action by a bus operator to enjoin the city officials from interfering with the operation of a bus line." The holding in the case was to the effect that there had been no failure to comply with the provisions of

32

the earlier ordinance, and the temporary injunction was continued. The sentence cited by the corporation counsel is, therefore, not material to the holding, but is mere dictum.

The bus defendants lay great stress upon *Colonial Motor Coach Corporation* v. *City of Oswego* (126 Misc. 829), and the corporation counsel extends himself in his attempts to distinguish that case. The common council of the city of Oswego adopted an ordinance on May 25, 1925, giving to the plaintiff the necessary consent to operate a motor vehicle route between Oswego and Watertown. On January 11, 1926, or seven and a half months later, the common council passed a resolution revoking the consent. Thereupon the plaintiff brought his action to declare the resolution invalid and to enjoin the mayor from signing it. A temporary injunction was granted and the order was affirmed by the Appellate Division. In support of its contention the plaintiff relied upon the fact that it had attorneys to represent it upon an application to the Public Service Commission for consent and permission to operate and for a certificate of convenience and necessity. It relied further upon the fact that it had incurred obligations in the purchase of a motor bus and a bus route then in operation between Oswego and Mapleview, being part of the longer route between Oswego and Watertown. Based upon these considerations, the court stated (at p. 835): " The privilege granted, therefore, was not inchoate and defeasible, but became a property right of which the plaintiff cannot be deprived at the mere whim of the city." Further (at p. 831): " Franchises are given and received upon the understanding that the grantee is protected by a contractual right from the very moment the grant is accepted, so long as its terms are complied with."

The very question presented to me as novel by the corporation counsel in our case appears on the brief of the city in the *Colonial* case. Point 2 of that brief bears this heading: " Even if the resolution of May 25, 1925, be viewed as an offer or grant of a franchise, still it has never ripened into a property or contract right of the plaintiff. It is at most inchoate and until it matures may properly be revoked." The argument must have been rejected, so that the *Colonial* case becomes an authority precisely in point for the proposition that the execution and delivery of the contract, without more, ripens the franchise into an irrevocable agreement.

In *Brooklyn Central R. R. Co.* v. *Brooklyn City R. R. Co.* (32 Barb. 358) the question whether the Central Railroad Company or the City Company had a franchise on Furman street, Brooklyn, was considered. The Brooklyn City Railroad Company had acquired a franchise in 1853, but the Central Railroad Company claimed that the Brooklyn common council in 1859 had passed a resolution

annulling that franchise and granting the franchise for the same territory, which was thereafter assigned to the Central Railroad Company. The court said (at p. 364): "The resolution of the common council of the city of Brooklyn of the 19th December, 1853, by which it signified its assent to the construction of the rail road * * * was authorized by the 5th subdivision of the 28th section of the general railroad act, and therefore lawful, and the acceptance thereof with the conditions annexed by the City Company, constituted a contract which the company was bound to perform, and which the common council could not rescind without adequate cause. Rights acquired under a statute of a state, which is in its nature a contract, and which does not reserve to the legislature the power of repeal, cannot be divested by subsequent legislation." (Citing *Dartmouth College* v. *Woodward*, 11 Wheat. 511.) (See, also, *Milhau* v. *Sharp*, 27 N. Y. 611.)

In *New York Electric Lines Co.* v. *Empire City Subway Co.* (235 U. S. 179) the common council of the city of New York had in 1883 granted by resolution permission to the New York Electric Lines Company to lay electric conductors in the city streets. The company accepted this resolution and filed a map, diagrams and statements, and did some experimental work in relation to the projects, but nothing toward the actual construction of conduits or laying of wires. On May 11, 1906, the board of estimate formally revoked the franchise by a resolution reciting that whatever rights the company had secured under the permission in question had long since been forfeited by non-user. The reasoning of the opinion is to the effect that a valid franchise was created which was not subject to arbitrary revocation, but could be revoked by reason of the twenty-three-year non-user. At page 193 the court said: "These municipal consents are intended to afford the basis of enterprise with reciprocal advantages, and it would be virtually impossible to fulfill the manifest intent of the legislature and to secure the benefits expected to flow from the privileges conferred, if, in the initial stages of the enterprise, when the necessary proceedings preliminary to the execution of the proposed work are being taken with due promptness, or when the work is under way, the municipal consent should be subject to revocation at any time by the authorities — not upon the ground that the contract had not been performed, or that any condition thereof, express or implied, had been broken, but because as yet no contract whatever had been made and there was nothing but a license, which might be withdrawn at pleasure. Grants like the one under consideration are not nude pacts, but rest upon obligations expressly or impliedly assumed to carry on the undertaking to which they relate. [Cita-

tions.] They are made and received with the understanding that the recipient is protected by a contractual right from the moment the grant is accepted and during the course of performance as contemplated, as well as after that performance."

There has recently (1928) been enacted section 69 of the Transportation Corporations Law. The new section provides for a new sort of revocable franchise called a " terminable permit," and also gives the city power to amend any existing franchise so as to turn it into a terminable permit, but expressly provides that such an amendment " shall only be made with the consent and agreement of the person, firm or corporation owning such license, grant, franchise, permit or consent." This negatives the idea of legislative intent that a municipality should have any general right to revoke.

The franchises in the present case are evidenced not only by resolutions adopted by the board of estimate and approved by the mayor, but also by formal contracts executed on the one hand by the city and on the other by the bus companies. If a bilateral contract is once spelled out, that contract as such is enforcible. In the *Colonial Motor Coach Case* (*supra*), for example, there was a resolution only, and no formal acceptance. It was incumbent, therefore, to prove facts from which an acceptance might be implied. In our case there is no doubt as to the acceptance.

A franchise is bilateral in its nature; besides conferring rights it imposes obligations. Acceptance is necessary to prove that the grantee has undertaken those obligations. Section 74 of the charter specifically calls for a " contract," not a revocable license. By the very terms of sections 72 and 74 the contract must be bilateral, must embrace not only the offer, but also the acceptance, and must furnish through the mutual promises the mutual consideration. There is nothing inchoate in such a contract. Section 74 surrounds it with special solemnities and special guaranties of public inquiry and mature consideration. The draftsmen of the charter were lawyers, familiar with the elementary differences between a " franchise " and a " contract " on the one hand, and a mere " license " on the other. There is nothing in section 74 to indicate that a franchise which has been once granted and executed may be revoked by either party without fraud or default. On the contrary, section 73 expressly excludes the idea of arbitrary or *ex parte* right of revocation, when it provides that " Every grant shall make adequate provision by way of forfeiture of the grant, or otherwise, to secure efficiency of public service at reasonable rates and the maintenance of the property in good condition throughout the full term of the grant."

The rules of law pertaining to the contracts of a municipality are not different from those pertaining to any other contract; the

obligations of the municipality to the other contracting party are fixed, and become its corporate obligations. The municipality is bound in its corporate capacity to the same extent as any private corporation or legal entity. *Safety Insulated W. & C. Co.* v. *Mayer, etc., of Baltimore* (66 Fed. 140) involved an attempt by the city of Baltimore to revoke (on advice of the corporation counsel and shortly after the acceptance of the resolution) a contract to furnish cables, etc., and to place underneath the streets a police and fire alarm telegraph system. The court said (at p. 144): " The courts cannot control this discretion. But when this discretion has been exercised, and the public improvements determined upon, and a contract made relative thereto, the legislative function has been exhausted and the duty has become purely ministerial. [Citations.] But, apart from and above all this, the obligation of a contract made between parties competent to contract cannot be impaired at the option of one of the contracting parties. This doctrine controls whether the party to the contract be a sovereign state or an humble individual. It has been enforced against the action of states when the subject matter of the contract was the exercise of the highest governmental and legislative powers,— the granting of a franchise. * * * And municipal corporations, mere creatures and agents of the sovereign, are not exempted from the operation of the rule."

This case was cited by the United States Supreme Court in *Walla Walla* v. *Walla Walla Water Co.* (172 U. S. 1, 10).

Even had the franchise not been granted in some formal instrument the proceedings after the grant would be sufficient to create an estoppel. The undisputed evidence shows that the bus companies, relying upon the franchises, and in compliance with their terms and conditions, proceeded, with the expenditure of considerable time and money, to carry out the various directions contained in them.

The defendants Omnibus and Madison deposited under the escrow agreement of December 28, 1933, pursuant to section 6 of the franchise contract, the sum of $325,000 in United States Treasury notes, an arrangement which was reported to the board of estimate, and on December twenty-ninth approved by the board in an appropriate resolution. Under subdivision 5 of section 2 of the franchise, applications were prepared and promptly filed with the transit commission and lengthy hearings held, two prior to January 26, 1934. The same section required the filing of a plan of readjustment and motorization of New York Railways Corporation with the transit commission within sixty days, together with declarations of intention to abandon the street railway routes.

Under the same subdivision Madison was required to prepare papers immediately for the abandonment of the Fourth and Madison street railway routes, and file them within sixty days with the transit commission. Calls were sent out for stockholders' meetings to approve the declarations of abandonment. Subdivision 25 of section 2 required the deposit with the comptroller of $100,000 as security by Omnibus and $20,000 by Madison. On January fourth these sums were deposited. Various counsel fees were incurred between December 26, 1933, and January 26, 1934.*

On behalf of Comprehensive, on January 5, 1934, there was deposited with the comptroller of the city of New York the agreed security of $15,000. A fee was paid to the Secretary of State for an increase of stock and reclassification of shares. Attorneys were retained.

The defendant Fifth Avenue in accordance with its contract made application to the transit commission on December 29, 1933, for certificates of convenience and necessity, engaged counsel, and took proceedings incurring financial obligations. Prior to January 20, 1934, it deposited $75,000 with the comptroller as security.

The plaintiff argues in her brief that, strangely enough, it is not the city which is estopped, but the defendants, on the ground that they had notice of all the proceedings taken by the plaintiff, for example, notice of the injunction suit, warnings given at the various meetings of the board of estimate, and other communications. It was hardly necessary for the defendants to refute this extraordinary claim. They were not required to notice the action of the plaintiff or any other litigant who questioned their rights. If the franchises were legally effected, the defendants were contractually bound to do their part.

The city proceeds on different grounds. By an ingenious argument, the corporation counsel attempts to waive aside the occurrences prior to December 26, 1933, the date on which the franchise contracts were executed. His contention is that anything done prior to December 26, 1933, was a " speculative anticipation," since there was no " existing fact " or " certain state of things " upon which the bus defendants could have relied to work out an estoppel. This is not correct. In business practice, negotiations tending toward certain results furnish sufficient basis for steps taken in reliance thereon. The fact that the plaintiff had instituted suit should not have been taken into consideration by the bus defendants. Any contract may come before the courts and any franchise may be attacked. The bus defendants had no alternative to

---

* I have previously called attention to the fact that the so-called resolution of revocation of January 26, 1934, did not include East Side.

resisting the various assaults of the plaintiff, against whom since October, 1933, they had appeared before this court, the Appellate Division, and the Court of Appeals. It was no surprise to them to be served with legal papers by the plaintiff.

Prior to January twenty-sixth they had no intimation of the position which the corporation counsel would take. In fact, before that date, the corporation counsel had moved to dismiss the complaint of this same plaintiff in a similar action, and the motion was granted. On January eleventh the corporation counsel stated in open court that he was a neutral party and neither supported nor opposed the motion for a temporary injunction.

On February second, when the counterclaim was served, the new attitude first became evident and the companies first realized that the corporation counsel, on most of the important issues of the case, rested substantially on the same grounds as the plaintiff. It is apparent that the change of attitude which took place in the office of the corporation counsel could not and should not affect the bus defendants.

Two remarks are added: No action whatever was taken by the city to restore the parties to the position they occupied at the time the franchise contracts were executed, and the record of the meetings of the new board gave no notice to these defendants of any disapproval of the franchises until at earliest January 26, 1934. Whatever might be said, in considering evidence with respect to the revocation as such based on the testimony of various members of the new board in an attempt to vary that record, can have no possible bearing on the question of estoppel, for the simple reason that whether the record was correct or not the defendants could not be expected to go behind it. Until February 2, 1934, when the city's answer was served, no unequivocal assertion of revocation had been made. All the bus defendants had to go upon, up to that date, was the publication of the minutes of the December, 1933, meetings in the City Record of January 17, 1934; the official typed minutes of January 19, 1934, which recited the approval of the December minutes as published on January 17, 1934; the publication of the January 19, 1934, minutes on February 20, 1934. Upon this picture, up to February 2, 1934, these defendants had a right to rely, and by that time they had taken all the action, already recited, upon which they depend to make out their estoppel.

The second of the three main points made by the plaintiff concerns section 74 of the Greater New York Charter, which reads in part as follows: " The board of estimate and apportionment shall make inquiry as to the money value of the franchise or right proposed to be granted and the adequacy of the compensation proposed

to be paid therefor, and shall embody the result of such inquiry in a form of contract, * * *. Such proposed contract, together with the form of resolution or resolutions for the granting of the same shall, but not until after the hearing upon the petition, be entered on the minutes of the board of estimate and apportionment."

This section has never squarely come up for interpretation and analysis. It provides for inquiry into (a) the money value of the franchise or right proposed to be granted, and (b) the adequacy of the compensation proposed to be paid therefor. No statutory definition of "inquiry," "money value," or "adequacy of the compensation" is given, nor are any rules formulated for determining the meaning of any of these three expressions, which it is one of my tasks in this litigation to construe and apply.

We have in evidence many hundreds of pages of minutes of the various meetings of the board of estimate. They resemble the minutes of other legislative bodies. Items appear upon the calendar, some important and others routine, to be passed upon. Reports of various subdivisions of the government are presented and considered. Sometimes they are tabled and at other times voted upon. The constitution of the board of estimate is essentially the same as that of other legislative bodies. Under the law it must act as a unit by a majority or other vote determined by statute, and individual opinions are not determinative of resolutions. An inquiry directed to be made by such a body must be the inquiry of the body. Generally it is based in large part, and it may be based entirely, upon a report submitted by the proper officer or division. It is scarcely possible for either the board of estimate or any member to be fully informed in advance upon any one of the complex situations which face it at meetings.

It might or might not be well were every member by training or experience an expert. In practice no American government, national, State or municipal, operates that way. Our system, with its frequent changes, places men in high office who are not required to possess, actually or in contemplation of law, high training or large experience to assist in the problems before them. The wheels of government must, and fortunately do, roll on nevertheless.

There were called as witnesses upon this trial the former mayor, the present mayor, the old and new comptroller, and numerous other former and present members of the board of estimate. The testimony which they gave was on the whole no different from testimony which would be given by the members of any legislative body. Some individuals displayed more information, some less. Some appeared able to state facts exactly, and others had forgotten or were inarticulate. A few showed force and leadership, while

one or two had been, by their own admission, tacit or express, following the member or members whom they regarded as best informed or most reliable. It is not the conduct of the individual member or members of the board which must be considered, but the action of the board as a whole. I doubt whether, were each member of any Legislature examined separately with a view to learn how any particular measure passed, a satisfactory conclusion could be reached. It is the group action taken, as officially recorded in the usual manner, which counts.

I have heard no contention that the practice followed by the board of estimate in December, 1933, differed from the practice in earlier years. The evidence discloses that forty-three grants of franchises were made by the board since 1914, exclusive of the one-year bus franchise granted to some twenty companies, covering forty-four routes, in the fall of 1932. The uniform practice of the board, when fixing the date for a final hearing on the application prior to the granting of a franchise, was to adopt a resolution which provided in substance as follows: " Whereas this board has made inquiry as to the money value of the franchise or right applied for and proposed to be granted to the company and the adequacy of the compensation proposed to be paid therefor, now therefore it is resolved  *  *  *."

Plaintiff concedes as probable that the inquiries made in prior franchises were no different from the one made in our case. She alleges in her complaint that the board made no inquiry into money value as required by section 74 of the charter preparatory to the awarding of the franchises to the defendants, despite the language of the adopted resolution. There is no substantial distinction in the franchises granted to the various defendants; in language and content, except for the necessary identification of the routes, they are the same.

The first premise in the argument of the plaintiff is that the mere recital in the franchise grant that inquiry into money value has been made does not establish that fact. (*Miller* v. *City of Amsterdam*, 149 N. Y. 288.) The plaintiff continues: " The term ' money value ' used in section 74 of the charter means something. Historically it was embodied in the charter, *inter alia*, to thwart the corrupt schemes notoriously prevalent in the franchise affairs of New York city. ' Money value ' is no obscure term, nor should the sophistry of litigants be permitted to obscure it. The ' money value ' of a house, a hat, a horse, a cow, an automobile, are simple concepts immediately perceived by the ordinary man. Likewise the ' money value ' of great modern organizations is something perfectly familiar to both the business and legislative minds of the country."

The plaintiff maintains that there is a complete distinction between money value and adequacy of compensation. It is not, she says, " the legal duty of the plaintiff in the present action to specify the method of inquiry into the ' money value.' Its contentions are established when it is proved that no inquiry was made beyond some pretense of inquiry."

The plaintiff offered through expert witnesses various methods of computing and ascertaining the money value, and in her brief presents an analysis of the testimony of the members of the old board of estimate to show that, with the exception of the borough president of Manhattan, none of them understood " money value." The arguments of the city and the plaintiff with respect to section 74 are divided into five parts: (a) The inquiries made as to the money value and adequacy of compensation were mere pretense; (b) even if the board acted in good faith its action was so remote from an *inquiry* that it cannot be regarded as a compliance; (c) the result of the inquiry was not embodied in the form of contract proposed to be executed; (d) whatever inquiry was attempted was not completed on September 29, 1933; (e) the sections of the charter with respect to the inquiry and the embodiment of such inquiry was explicit and unambiguous, and leave no room for construction by practice or otherwise.

Section 74 was discussed by the Court of Appeals in *Blanshard* v. *City of New York* (*supra*, at p. 11): " The Greater New York Charter, section 74, provides that before any grant of a ' franchise or right ' to use any street shall be made by the Board of Estimate and Apportionment, the following things shall be done: (1) A public hearing shall be held upon the petition therefor. (2) The Board of Estimate and Apportionment shall make inquiry as to the money value of the franchise. (3) The Board shall make inquiry as to the adequacy of the compensation proposed to be paid therefor. (4) The Board shall embody the result of such inquiry in a form of contract. (5) The Board shall hold a public hearing on the proposed contract after public notice."

This is a very clear summary of the main provisions. However, it leaves undetermined our questions with respect to the meaning of inquiry, money value and the adequacy of the compensation.

The corporation counsel in his brief takes great pains to show the history of this statute from 1897 to 1914, but the recital throws no light upon the meaning of the words " inquiry as to the money value of the franchise or right proposed to be granted and the adequacy of the compensation proposed to be paid therefor." It indicates only that a further safeguard was added in the section requiring the *publication* of the result of such inquiry in a certain

manner. The city is in accord with the plaintiff and maintains that the minutes of the various meetings of the board of estimate will disclose no inquiry, but an entire lack of familiarity on the part of the board with any tests or rules for ascertaining money value.

Does inquiry mean superficial investigation or thorough study? Must the individual member read text books and the board take testimony? Is it necessary that the inquiry be personally made by each member, or may reliance be placed upon reports and findings of others? May information acquired in (say) 1931 be treated as part of an inquiry terminating in 1933? Is money value treated as value in the abstract, or in dollars and cents? Are physical assets only to be taken into consideration, or must the convenience of the public and city planning also enter the picture? What tests are to be applied and what rules promulgated? Is it lay opinion that governs, or the conclusion of an expert? With reference to whom is adequacy of compensation to be regarded, and how is it to be estimated? May we consider less concrete benefits than money when we speak of compensation?

Section 74 of the charter does not require that the board shall *determine* what the money value of a franchise is, nor that the board shall *fix* the money value of a franchise. The requirement is only that the board shall *make an inquiry* into the money value and the adequacy of compensation, so I have before me only the question as to whether *any* inquiry was made. I find from the evidence that there was an inquiry into money value by the board, and that the board had before it sufficient elements and facts to form the basis of such an inquiry. I shall not summarize the voluminous record on this point, but refer only to certain evidence.

The petitions filed, which led up to the franchise contracts, show on their face that they constituted one more step in the effort for motorization of street car lines. This matter had been before the board time and again for years, probably since 1924. Numerous companies had made applications, all of which had been referred to the board of transportation. Investigations were conducted, surveys made, and seven long reports submitted to the board of estimate. The sixth report of Chairman Delaney was presented September 14, 1926. The elements which, according to the memory and opinion of Borough President Levy, entered into the analysis of the various proposals, were read into evidence. Among them are: Money value of the franchises, rates of fare, length of ride, transfer privileges, co-ordination of service, equipment, operating expenses, investment required, and estimated financial revenue. The number of passengers carried on existing bus lines is discussed, as well as equipment, investment, etc. This so-called sixth report

is a detailed document reciting revenue bus miles, revenue bus hours, expenses, depreciation, rate of wages, etc. It is, indeed, an exhaustive treatise upon the subject of bus operation.

The seventh Delaney report was filed on September 2, 1930. It refers to the comprehensiveness of the bus system, mileage, transformation of street car lines, substitution of omnibuses for street cars, number of passengers, legal requirements under the Transportation Corporations Law, city's power to grant a terminable permit, and objections to the Equitable Coach Company. As a result of this report and the conference which preceded it, the New York Railways, the trolley company already mentioned, made its first definite offer of complete motorization on November 19, 1930. In 1931 a special committee was appointed by the board of estimate to reach a solution of the problem of bus franchises in Manhattan. This committee had before it a memorandum of financial data dated March 13, 1931. Together with this memorandum was transmitted preliminary proof of a proposed plan of readjustment and motorization prepared upon the assumptions that the term of the omnibus franchise will be for twenty-five years and that the system would include the six new crosstown lines. Many conferences of the special committee were held.

On July 10, 1931, three forms of proposed contract were formally presented to the board of estimate, and discussion was had. The deputy comptroller held hearings throughout the summer of 1931, culminating in his report dated October 9, 1931. Much time and effort were spent at the meetings of the board of estimate in connection with these reports and with the various bus problems in which the plaintiff and numerous civic associations participated. Until April, 1933, the whole matter of the proposed franchise contracts was held in abeyance by the board because the validity of the franchise of Fifth avenue on certain routes was being tested in the courts.

The board of estimate is a continuing body. The fact of a change in personnel by election, appointment or otherwise, does not affect the action of the body. It is an entity and continues to survive every change in its makeup. A new set of individuals succeeding an old set does not create a new board of estimate as such. There is no hiatus, nor any line of demarcation. In popular parlance, we refer to a new board of estimate and an old board of estimate. Technically, the expression is inaccurate, and the new board, so called, has no more right or power to revoke, rescind or modify any proper action taken by the old board, so called, than the old board itself had. In the eyes of the law this body continued as a legal entity from the time it was first established by statute until today. (See *Matter of Mayor, etc., of New York*, 193 N. Y. 503, 517.)

There is in my mind no question that the board of estimate made an inquiry within the meaning of section 74 of the charter.

The statute nowhere prescribes a formula by which the money value is to be fixed or determined, nor does it require any fixing or determination of money value. No one can deal with this problem with mathematical exactitude, and we have been unable to find a case which lays down a set of rules for such determination. Section 74 refrains (wisely, in my opinion) from specifying how or in what manner money value can be arrived at. Almost any factor even remotely bearing upon the subject may enter into its consideration. The problem is so vast and the elements involved are so many and complicated that no one test can be found, nor can it be said that any particular group of tests will suffice. The same holds true of the adequacy of compensation, though to a lesser degree. Here we are dealing with a benefit to be obtained. From the record it is clear that the adequacy of compensation to the city was often discussed and reported upon. There was sufficient compliance with section 74 in respect to both money value and adequacy of compensation.

The procedure required under this section is legislative procedure and the inquiry to be conducted is a legislative inquiry and part of the legislative act. No right of review is given to any court, and nobody (except the electorate) is authorized to pass upon the discretion exercised by the board, upon the methods which it pursues, or upon the legislative conclusions which it reaches. (See *McCabe* v. *City of New York*, 213 N. Y. 468, 484, where the court quotes from Cooley's "Constitutional Limitations," 7th ed. pp. 305, 306: "'And the same presumption that legislative action has been devised and adopted on adequate information and under the influence of correct motives, will be applied to the discretionary action of municipal bodies, and of the State legislature, and will preclude, in the one case as in the other, all collateral attack.'")

The board of estimate under section 74 has wide discretion, and must take all things into consideration. (See *Blanshard Case*, *supra*, p. 12: "The purpose of these charter provisions is apparent on their face. The city should procure the most advantageous return, all things considered, for the right to operate buses or railroads in its streets and protect the public against favoritism and unfair dealing.")

The proposition is summarized in *Browne* v. *Walker* (131 Misc. 736), where the franchise granted to the Equitable Coach Company was under judicial scrutiny. The court said (at p. 741): "The board has, acting upon its judgment, determined the adequacy of the compensation to be paid for the franchises in ques-

tion, has embodied in the form of the contract such compensation and the terms and conditions including the provisions as to rates, fares and charges. * * * The board of estimate and apportionment acted, among other things, upon the reports of the board of transportation of the city, which investigated the questions of the fare to be charged, the service to be rendered, the transfer facilities, the financial ability of the companies and the compensation to be paid to the city. The board of estimate and apportionment has exercised its discretion, and, acting in a legislative capacity, has granted these franchises."

Since the question of interpreting section 74 is one of statutory construction, great weight must be given to the administrative practice of the city authorities who are vested with the power of carrying out the provisions of that section. Evidence as to such practice was supplied by several witnesses in connection with all the franchises granted in the past thirty years. In no instance was money value ever expressed in a lump sum. (See *City of New York* v. *New York City Ry. Co.*, 193 N. Y. 543, where the court said, at p. 549: " So, when the meaning of a statute is doubtful, a practical construction by those for whom the law was enacted, or by public officers whose duty it was to enforce it, acquiesced in by all for a long period of time, in the language of Mr. Justice NELSON, ' is entitled to great if not controlling influence.' ") (See, also, *Robertson* v. *Downing*, 127 U. S. 607, 613; *United States* v. *Falk & Brother*, 204 id. 143, 152; *Bullock* v. *Cooley*, 225 N. Y. 566, 571.)

It is not disputed that the board of estimate in granting the franchise acts in a legislative capacity. (See *Matter of McEneny* v. *McKee*, 236 App. Div. 140; affd., 262 N. Y. 494; also *Matter of Sloane* v. *Walsh*, 245 id. 208, where the court said [at p. 214]: " The resolution constituted the action of the Board. That action cannot be disputed by a reference to the oral statements made by those who concurred therein. We can look only to the resolution, and, so looking, we find that the Board exercised the powers conferred upon it by section 21, and legally varied the zoning resolution, in petitioner's favor.") (See, also, *People* v. *Devlin*, 33 N. Y. 269; *People ex rel. Durham Realty Corp.* v. *La Fetra*, 195 App. Div. 280; affd., 230 N. Y. 429.)

This court may not sit in review upon the exercise of business judgment by the board of estimate. (See *Matter of Young Women's Hebrew Assn.* v. *Board of Standards and Appeals of City of N. Y.*, N. Y. L. J. Feb. 16, 1934; affd., 242 App. Div. 626.) The Court of Appeals said in *People ex rel. McLean* v. *Flagg* (46 N. Y. 401, 405): " we have no right to inquire into the motives or reasons for doing the particular act." (See, also, *Talcott* v. *City of Buffalo*, 125 N. Y. 280, 286, and *McCabe* v. *City of N. Y.*, *supra*, at p. 485.)

The Court of Appeals has gone even further. It has established once and for all that even if a complaint should allege wrongful motives it would be held insufficient, so that the judiciary would not inquire into legislative motives. (See *Kittinger* v. *Buffalo Traction Co.*, 160 N. Y. 377; reaffd. in the *Blanshard* case.) Even if there is a mistake or a misunderstanding, the court has no power to review the findings and acts of the board of estimate in its capacity as a legislative body. (See *Matter of Long Island R. R. Co.* v. *Hylan*, 240 N. Y. 199, 208: " It may have based its attempted action upon an erroneous interpretation of a contract, upon an erroneous view of the law or upon an erroneous assumption of fact but its functions are still legislative and not judicial and the court may not review its action as if it had judicial functions.")

This is a salutary rule. Even the two expert witnesses produced by plaintiff differed between themselves as to how the money value of a franchise was to be arrived at.

The corporation counsel concludes: " The City does not contend that the Board was *required* to follow any particular rule. It does contend that the Board should have employed some reasonable method, such as the net earnings method, which has received uniform approval by the courts of this State."

I hold that it is not for the court to review the action of the board of estimate, nor to fix any rule or rules for their guidance in making the inquiry. All that the board is required to do is *to make an inquiry.* This it did.

The plaintiff and the city joined in asserting failure to comply with the statutory requirement that the result of the inquiry be embodied in the form of contract. From the documents before me and the practice of the board, there was compliance. The various franchise contracts are in evidence. Since no lump sum was fixed by the board the contracts were properly drawn, for they did contain the results of the inquiry in accordance with the long-continued practice of the board. (*City of New York* v. *New York City Railway Co., supra.*)

Our third important question concerns itself with voting. Many witnesses were called on the issue of fact; the interpretation of the notes of the stenographers who took the minutes of the various meetings, and the interpolations by these reporters, occasioned some acrimony.*

---

* It should be noted that not all the defendants are affected by the alleged improper voting. The attack of the plaintiff is primarily directed against Omnibus, Madison and Comprehensive, the argument being that the resolutions of December 22, 1933, purporting to authorize these franchises, lacked the required votes.

Section 74 makes the following provision with respect to voting: " Every contract or resolution containing or making such grant, shall require the concurrence of members of the board of estimate and apportionment, entitled, as provided by law, to three-fourths of the total number of votes to which all the members of the said board shall be entitled, and the votes shall be shown by the ayes and noes, as recorded in the minutes of the board."

Section 226 of the charter reads in part as follows: " The mayor, comptroller, president of the board of aldermen and the presidents of the boroughs of Manhattan, Brooklyn, The Bronx, Queens and Richmond shall constitute the board of estimate and apportionment. Except as otherwise specifically provided, every act of the board of estimate and apportionment shall be by resolution adopted by a majority of the whole number of votes authorized by this section to be cast by said board. The mayor, comptroller and the president of the board of aldermen shall each be entitled to cast three votes; the presidents of the boroughs of Manhattan and Brooklyn shall each be entitled to cast two votes; and the presidents of the boroughs of The Bronx, Queens and Richmond shall each be entitled to cast one vote."

Referring to the Comprehensive contract, it is admitted that the comptroller refused to cast his three votes and the president of the borough of Queens voted " No." The vote of the president of the borough of Richmond was, therefore, essential for the adoption of the resolution.

The plaintiff, in her brief, makes three points: (1) Neither the borough president nor the commissioner of public works was called upon to vote for the resolution, nor did he vote; (2) the commissioner of public works occupied the chair of the borough president even though the borough president was not ill, and was actually present; (3) under the charter the commissioner of public works may not vote in the board of estimate on the granting of franchises.

Not only the printed record of the board of estimate, but also the typewritten minutes and the original stenographers' minutes were produced at the trial and received in evidence. The stenographers who took the minutes at the meetings of the board of estimate and recorded this particular vote were examined and cross-examined.

It appears that at no time in the history of the board of estimate were strictly formal and express answers to any vote taken. If a member of the board was silent, his silence was construed as assent. This was the uniform practice. Votes of " No " were always required and recorded, as were notations of failure to vote. This practice, in view of the manner in which the meetings were conducted, was justified. All the members, prior to any meeting,

had notice of the items which would be presented at the meeting and which were to be acted upon by them. If any study was to be made or any consideration given to these items, it must necessarily have taken place in advance of the roll call on the vote. In the case at bar many meetings had been held, and these particular franchises had been frequently up for discussion with full argument and amplification, not only by the applicants and their opponents, but by numerous civic organizations as well. It cannot be said that at the time the board was called upon to vote upon these franchises the members were unfamiliar with the position which they would take, or were dubious as to how they would cast their votes.

There is considerable conflict over the original notes of the vote as taken down by the stenographers, but no question whatever about the record as such, or the final report as contained in the printed volumes of the proceedings of the board of estimate.

In this collateral proceeding by a taxpayer to set aside franchises, I shall not go behind the record, which shows a sufficient vote. I find that the commissioner of public works of the borough of Richmond was acting in behalf of Borough President Lynch who was absent at the time of the vote, having left because of illness. This disposes of the first two contentions of the plaintiff recited above, numbered 1 and 2.

No. 3 under this head must be considered at greater length, and it remains for us now to examine the law as to the propriety of the substitution of the commissioner of public works for the borough president in the granting of these franchises.

Section 383 of the charter provides that the commissioner of public works of a borough may " discharge all the duties of " the borough president under any one of three conditions, viz., the absence of the borough president, his illness or his request.* A letter filed with the board of estimate on November 9, 1933, is in evidence certifying that the commissioner of public works was authorized, in the absence of the borough president, to sit as a member of the board. This certificate was made in reliance upon a practice of the board of estimate which had existed for many years. Since 1915 more than twenty franchises, granted by the board of estimate and apportionment, have been adopted by vote of one or more of the commissioners of public works sitting in the place of their borough presidents.

---

* See the latter part of·the section: " Whenever by any of the provisions of this Act powers are conferred or duties are imposed upon a president of a borough, such powers may be exercised and such duties may be performed, upon the request of said president, by the commissioner of public works of said borough, if such official shall have been appointed."

33

In *Matter of Richmond Railways, Inc.,* v. *Gilchrist* (*supra*) it was held that under section 383 the commissioner of public works sat in the board " by express authority of the legislature," and not by any authority derived from his superior and, consequently, he " acts for his superior ' by the force of the statute ' " (p. 375). The court there said (See p. 376): "It is equally, if not more important, however, that the business, legislative included, of a large municipality shall proceed and not be obstructed by the illness or temporary absence, willful, perchance, of some of its officers. To meet this contingency the Legislature itself has provided that the respective commissioners of public works shall be members of the board of estimate and apportionment in case of the illness or absence of their respective borough presidents." The court went on to say (at p. 377): " it is to be borne in mind that a public official is presumed to act legally; and even without evidence to show the absence of illness of the borough president, such presumption would lend *prima facie* validity to the vote cast by the commissioner of public works of such borough."

The plaintiff and the city tried to prove that section 383 has application only to administrative duties and not legislative duties, and thus to avoid this very *Matter of Richmond Railways.* The plaintiff considers that the *Richmond Railways* case supports her contention. The city, however, is more reluctant and actually says: " It is respectfully submitted that the Appellate Division erred in the *Gilchrist* case holding that the simultaneous amendment of section 383 had the effect of defeating the express purpose of converting the Board of Estimate into a wholly elected body." The city does not dispute the practical construction placed upon the statute by the conduct of the board of estimate for many years.

A commissioner of public works sits as a member of the board of estimate and apportionment in any case by virtue of the authority of section 383 of the charter: " * * * He may appoint and at pleasure remove a commissioner of public works for his borough, who may discharge all the administrative powers of the president of the borough relating to streets, sewers, public buildings and supplies conferred upon him by this act; and who shall, in the absence or illness of such president discharge all the duties of such president."

Under this section the commissioner of public works, whom the borough president may remove at his pleasure, is given two distinct classes of power (1) " all the administrative powers of the president of the borough relating to streets, sewers, public buildings and supplies," and (2) when the president is absent or ill, " all the duties of such president." The section thus makes a distinction between the two classes of power. (See *Matter of Richmond Railways,*

*supra*, p. 375: "The apposition of the duties of the commissioner, classified as 'all the administrative powers' and 'all the duties' of the borough president is highly significant.") Despite this distinction, the city and the plaintiff argue that the section refers only to administrative powers, which is, of course, contrary to the *Matter of Richmond Railways (supra)*.

Section 383 was amended by Local Law No. 1 of 1929, which refers specifically to the board of estimate and apportionment: "In the event of the illness or absence of the commissioner of public works or the assistant commissioner of public works, the president of the borough may in writing confer upon any subordinate duly designated by him, such powers and such duties as by the provisions of this act he is authorized to confer upon the said commissioner of public works or the said assistant commissioner of public works, except, that such subordinate so designated shall not be authorized by such designation to act for or represent the said borough president upon the board of estimate and apportionment of the city of New York, nor upon any of the committees of the said board of estimate, nor in the exercise of any power or authority vested in the said borough president by reason of his membership in the said board of estimate and apportionment. He shall, within the borough for which he shall have been elected, have cognizance and control: * * *." Any doubt originally existing with respect to the meaning of section 383 would seem to be resolved by this amendment. *Matter of Richmond Railways (supra)* so held at page 373. This is not a delegation of power by an elected official to a non-elected official. It is the case of vesting power in the commissioner himself by statute. The court said (at p. 375): "There was, however, no delegation of their powers by the presidents of these boroughs to the commissioners of public works of such boroughs. The presidents being absent, the commissioners of public works in such boroughs were constituted members of the board of estimate and apportionment, not by their superiors, the presidents of such boroughs, but by express authority of the Legislature under the provisions of section 383 of the charter. Under this section the commissioner of public works acts for his superior 'by the force of the statute' (*Culp v. City of New York*, 146 App. Div. 326). The power is not delegated by an elective officer." (See *Culp v. City of New York*, 146 App. Div. 326, at p. 328.)

Any question of unconstitutionality of this statute is resolved by *Wilcox v. McClellan* (185 N. Y. 9) (cited in *Matter of Richmond Railways* at p. 376).

*Matter of Richmond Railways* has been followed in *Meth v. City of New York* (142 Misc. 203, at p. 207).

In support of the argument that the commissioner of public works may not sit in the place of the borough president the city cites *People ex rel. Collins* v. *Ahearn, No. 2* (137 App. Div. 265) and *People ex rel. Buckbee* v. *Biggs* (171 id. 373). Both these cases are distinguishable; and, in any event, I must follow *Matter of Richmond Railways*. It will be noted that in the *Richmond Railways* case the corporation counsel took a position directly contrary to the one now occupied by the city.

The history of the legislation on this subject supports the contention of the defendants. Under the charter of 1897 the powers of the borough presidents were rather limited, and though elective, they were not members of the board of estimate. Under an amendment of 1901 they became members. Section 382 of the 1897 charter provided: " In case of the disability of any president of the borough caused by protracted illness there shall be elected in the same manner as for a vacancy, a president of the borough *pro tempore*, who shall act until the president is able to perform the duties of his office."

In the amended charter of 1901 part of section 382 was repealed and the borough president was given authorization to appoint a commissioner of public works, " who shall, in the absence or illness of such president, discharge all the duties of such president." (§ 383.)

At the time the vote for Comprehensive was cast on December 22, 1933, there were present on the board officials who had been members for a long period of years and were fully familiar with its practice. Experienced counsel opposed the grants, ready to challenge their validity upon proper occasion. Every one saw that the commissioner of public works occupied the chair of the borough president of Richmond, and every one had notice that his vote was essential to complete the twelve necessary for a valid grant. There is no doubt, either in the exhibits or in the testimony, about the fact that at the conclusion of the voting the mayor announced " the resolution is adopted." This was heard and no objection or challenge was raised then, or, it seems, until the institution of this suit on December 29, 1933.

Lastly, in law the court may not go behind the official records of the board of estimate certifying that the commissioner of public works in the place of the borough president of Richmond voted for the Comprehensive franchise. (See *People* v. *Devlin, supra*, in which it was held that where the journals of the Legislature do not show that a bill was passed by a two-thirds vote instead of a mere majority, parol evidence may be received to show whether or not it did, in fact, receive the assent of two-thirds; but where the

journals did show that the bill was passed by a certain vote the court could not receive parol evidence to show that this record was untrue.) To hold otherwise, says the court, would be too dangerous in its consequences — too destructive of public confidence (pp. 281, 282).

Any ambiguity which might have existed was cleared by the resolution of December 29, 1933, on these very franchises, which were then adopted by thirteen affirmative unchallenged votes.*

An important practical feature of this litigation has been the situation which existed during 1932 and 1933 and earlier. The plaintiff, suing as a taxpayer, is the wife of the attorney for the Green Bus Lines, Inc., the unsuccessful bidder for six of the Manhattan crosstown lines at present operated by it. For fourteen years the Green Bus Lines consisted of individual operators working as a co-operative. They paid no tax to the city until 1932, when they did pay ten per cent on their gross receipts, some $150,000 out of $1,500,000. In the fall and winter of 1933 various companies made offers. The Green Bus increased its own offer from ten to twelve and one-half per cent, but failed to show how such payments could be met on its own financial set-up.

The defendants together form a comprehensive system. With the exception of Eighth and Ninth avenues, practically all the important thoroughfares are included. Green Bus operates only six crosstown lines in Manhattan, and upon the trial, as well as before the board of estimate, was unable to show how it could transfer or connect with other lines to the advantage of the public. No doubt the loss of these lucrative routes to the Green Bus Lines (and to the plaintiff) would be irreparable. This accounts for many of the charges and some of the bitterness before the board of estimate and upon the trial of this action, if not, indeed, for the whole litigation instituted by plaintiff.

During the entire proceeding with respect to these franchises, the meetings of the board of estimate and the return of the various reports, many charges, both veiled and express, were made by the plaintiff of fraud and corruption in the board of estimate relating to the bus situation. No evidence whatever of either fraud or corruption was produced at the trial. Upon his opening the corporation counsel stated that questions of fraud or corruption would not enter into the defense of the city. The plaintiff was at first reluctant to withdraw these particular charges from the case, but finally did so, even though, in the main and reply briefs, their echoes

---

* The preceding discussion (on voting) has no application to the Fifth Avenue Coach Company, whose franchise concededly received the unanimous vote of the board.

are heard. I do not find a scintilla of evidence in this long and intricate record to support any such charge, and it will accordingly not be considered. If collusion is to be regarded as a separate matter, I find no evidence of that: the co-operation of the bus defendants does not constitute collusion. I do recognize the practical situation which existed before the board of estimate and in the city of New York relating to motorization and the Green Bus Lines.

The motorization of the street car lines is a very grave matter of public interest. It is agreed that the present street car lines are altogether unsatisfactory, and that the service which the public receives is far from good, due to poor physical equipment. The day of the street car in the city of New York is past. Just as horse cars were supplanted by the trolley, so the trolley will be supplanted by the bus. It was established upon the trial that the number of passengers using buses on lines formerly served by street cars has greatly increased. The city of New York cannot motorize its main arteries unless the New York Railways Company surrenders its perpetual franchises. This was and should have been a weighty consideration, for which further inducements were to be expected. Unfortunately, the plaintiff and the Green Bus Lines are interested in the inducement which the bus defendants claim, as rightfully theirs. The litigation in this case centers about that prize.

The franchises as granted proceeded, as I say, on the theory of a comprehensive system. They are interrelated, and certain provisions contained in each have reference to, and are connected with, certain provisions contained in the others. The idea behind the set-up was to afford mutual transfer privileges which, the bus companies contend, will inestimably benefit the public.

Numerous important questions of law were raised in addition to those already discussed. The complaint points out several other respects in which the franchises are said to be illegal and improper. Proof sufficient to sustain any one important charge would void the franchises: unless the franchises granted conform to the statutes and the rules of law, they must fall. This, as already indicated, is why the court has believed that a careful and categorical discussion of all the points seriously raised could not be avoided.

It is claimed that there was no compliance with section 178 of the Railroad Law. The Omnibus and Madison contracts (Sec. 2, subd. 6) recite that " (c) The Company shall, immediately upon the date when the New York Railways Corporation, its subsidiaries and the New York and Harlem Railroad Company, shall file their declarations of abandonment in the office of the Depart-

ment of State, as herein provided, pay to the City a sum of One hundred and Sixty Thousand Dollars ($160,000), which sum shall be in lieu of any requirements on the part of the Company, the New York Railways Corporation, its subsidiaries, and the New York and Harlem Railroad Company to remove the rails of the track, slot rails, hand-hole frames, hand-hole covers or any other parts of the railway structure within the streets, sold, assigned, granted and conveyed unto the City by the said railways companies.

" In consideration of the foregoing agreements on the part of the Company, it is agreed that from and after the date of the filing of said declarations of abandonment in the office of the Department of State, as herein provided, the City shall assume the obligations on the part of the New York Railways Corporation, its subsidiaries and the New York and Harlem Railroad Company, to pave or repair that portion of the streets or avenues between the tracks sold, assigned, granted and conveyed unto the City, the rails of the said tracks and two (2) feet in width outside the said tracks."

Under (a) and (b) of subdivision 6 the declarations of abandonment of the routes are to be filed and the companies " shall each sell, assign, grant and convey unto the City, * * * all its right, title and interest in and to " the street railway structures.

The plaintiff argues that the board of estimate cannot relieve a railroad corporation of its obligation to remove any portion of the railroad property and to repave the railroad area or to impose any cost upon the city, relying upon section 178 of the Railroad Law. It is obvious that the city would expend many times the sum paid to it in removing the rails and in repaving.*

I shall not discuss the bargain made by the city with the bus companies in this respect, for I have said above that the court cannot and should not substitute its business judgment for that of the board of estimate.

In answer, however, to the contention of the plaintiff that a city could not by contract relieve a street railway of its obligation under section 178 of the Railroad Law, the bus defendants point out that in the present case there is no attempt to relieve the street railway company of any definite obligation up to the date of the abandonment of the franchise. Under the contracts the tracks are conveyed to the city at the time of such abandonment and thereafter the street railway company will have no title to them. Section 178 of the Railroad Law has application only when the street rail-

* The total sum to be paid to the city by the companies in lieu of paving and rail removal was $200,000.

way company shall " use or maintain * * * the tracks." It can have no application after the date of the conveyance to the city. Such is my interpretation of section 178.

The case of *Village of Stillwater* v. *Hudson Valley Ry. Co.* (255 N. Y. 144) is distinguishable. That was not a situation where any abandonment was undertaken pursuant to a contract with the city, but where the grantee had breached its franchise contract.

Section 198 of the Railroad Law is as follows: " The board of estimate and apportionment * * * shall have the power in their discretion, to enter into a contract or contracts on behalf of the city with any railroad corporation or corporations owning or operating street surface railroads or other railroads in such city, for the purpose of adjusting any or all differences now existing between such corporation or corporations and such city with respect to car license fees, percentages upon gross earnings, rentals and any other payments, other than taxes upon real and personal property, and capital stock, payable or claimed to be payable to the city under the existing acts of the legislature, municipal ordinances, grants by, or contracts with, the municipal authorities or otherwise; * * *. No contract shall be made or modified hereunder without the written consent and approval of the mayor and of the comptroller or other chief financial officer of the city."

The city says that the statute was neither followed in form nor in substance because the written consent of the comptroller is lacking — a necessary requisite under section 198; that the comptroller, in fact, did not vote at all; that this was a *caveat* to the board of the illegality of its proposed action; accordingly, that when the other members of the board attempted to pass the resolution, they acted beyond their powers. A short answer to this contention is that the franchises were not granted pursuant to section 198 of the Railroad Law, but pursuant to sections 72, 73 and 74 of the charter.

Section 149 of the charter says that the comptroller " shall settle and adjust all claims in favor of or against the corporation, and all accounts in which the corporation is concerned as debtor or creditor." In its brief the city argues that, since the removal of the tracks and the payment of $200,000 constitute a settlement between the city and the bus defendants, section 149 applies, and the failure of the comptroller to " settle and adjust " the claim renders the whole contract invalid. That is not a proper construction of the statute, which obviously refers, not to franchises but to settlements and adjustments of ordinary routine claims.

Accordingly, I hold that the contracts do not violate either sections 178 or 198 of the Railroad Law or section 149 of the charter.

The plaintiff also alleged in its complaint that the contracts were in violation of section 242-d of the charter. At the trial, attention was called to the fact that this section had been declared unconstitutional by the Court of Appeals (*Matter of McCabe* v. *Voorhis*, 243 N. Y. 401), so the claim was of course withdrawn.

In addition to the franchise contracts, there were supplemental agreements. It is conceded that the supplemental agreements were not advertised, and plaintiff and city call this omission fatal. There is no requirement, however, that supplemental agreements must be advertised, as each franchise contract is complete in itself.

The remaining points made by the plaintiff, *i. e.*, with respect to transfers, fare rates, excessive period of franchise, lack of recapture provisions, lack of financial ability of some of the bus defendants, objectionable mortgage clauses and provisions for transfer of franchises, are all matters upon which the board of estimate exercised its business judgment. The principles to be applied have already been discussed. As there is neither allegation nor proof of illegality in any of these respects, but at most only of unwisdom or error, the court will not attempt to substitute its judgment for that of the duly constituted legislative authority.

The waste alleged by the city appears to be constructive in its nature, based on legal contentions already examined and overruled. In the event any question of fact exists, I find it in favor of the bus defendants. As said in *Talcott* v. *City of Buffalo* (*supra*, at p. 286): " The terms ' waste ' and ' injury ' used in this statute comprehended only illegal, wrongful or dishonest official acts, and were not intended to subject the official action of boards, officers or municipal bodies acting within the limits of their jurisdiction and discretion, but which some taxpayer might conceive to be unwise, improvident or based on errors of judgment, to the supervision of the judicial tribunals."

Since in a long trial, with ample opportunity to make proof according to the allegations of the complaint and counterclaim, no evidence was produced of waste or injury in the legal sense, and none of fraud or collusion in any sense, the court is under the authorities without power to interfere in the matter of these bus franchises.

Judgment for the defendants New York City Omnibus Corporation, Madison Avenue Coach Company, Inc., Comprehensive Omnibus Corporation, Fifth Avenue Coach Company and East Side Omnibus Corporation against the plaintiff and the city of New York accordingly, dismissing the complaint and the counterclaim respectively. Settle findings and decree.