UNITED STATES v. 53¼ ACRES OF LAND IN BOROUGH OF BROOKLYN, KINGS COUNTY, N. Y., et al.

Misc. No. 494.

District Court, E. D. New York.

Nov. 5, 1942.

See, also, D.C., 42 F.Supp. 746.

Harry T. Dolan, Sp. Asst. to Atty. Gen. (Edward H. Murphy, Sp. Asst. to Department of Justice, of New York City, of counsel) for petitioner-plaintiff.

Parsons, Closson & McIlvaine, of New York City (Clinton T. Roe, Charles P. Kramer, and Henry Herz, all of New York City, of counsel), for defendant Brooklyn Eastern District Terminal.

William C. Chanler, Corp. Counsel, of New York City (Julius Isaacs, Leo Brown, and Charles Bisberg, all of New York City, of counsel), for defendant City of New York.

ABRUZZO, District Judge.

This proceeding has been brought by the United States of America to acquire 53¼ acres of land, more or less, and the improvements, rights and interests of all per-

sons having an estate or interest therein, in the Borough of Brooklyn, County of Kings, State of New York, for the extension of the United States Navy Yard, New York.

The property taken consisted of Wallabout Market, a public market owned and operated by the City of New York under the jurisdiction of the Department of Markets of the City.

The petition in condemnation herein was filed on April 1, 1941, together with a declaration of taking containing a description of the land sought to be acquired. With the petition and the declaration of taking, there was deposited with the Registry of this Court the unallocated sum of $4,000,-000, to be distributed to the persons entitled to it pursuant to the provisions of the Declaration Taking Act, 40 U.S.C.A. § 258a.

Title in fee simple vested in the United States of America, the petitioner-plaintiff, on April 1, 1941, and a judgment was duly entered on that date directing that possession of the property be delivered immediately to the United States of America.

The proceeding for the taking of the above described land having been held before this Court, jurisdiction vests properly in it to make such further orders, judgments or decrees as it may deem necessary.

The defendant, Brooklyn Eastern District Terminal, hereinafter referred to as the Terminal, appeared and served an answer to the petition herein. Its answer sets forth a claim for compensation by reason of the appropriation of its property rights in Lots Numbers 1, 2, 3, 46, 188, 189, 190, 191, 192, 193, 194, 198 and 201, as they appear on the Damage Map, dated March 4, 1941, filed in this proceeding.

By notice of motion, dated June 6, 1941, returnable before this Court July 2, 1941, the Terminal applied for an order directing the Clerk of this Court to pay to it the sum of $700,000 or such amount as to the Court shall seem just and proper, out of the money deposited in the Registry of this Court on account of the just compensation to be awarded to the Terminal pursuant to Section 258a of 40 U.S.C.A.

It is conceded by all of the parties herein that the Court has power to grant a preliminary award in any amount that it might deem just and proper.

In view of the issues raised upon the return of this motion instituted by the Brooklyn Eastern District Terminal by the City of New York, hereinafter referred to as the City, it was impossible upon the affidavits before the Court to properly determine this matter. Whereupon, it was directed that the issues be set down for trial so disposition of them could be effected. The order directed that the following constituted the triable issues:

1. The construction, interpretation and legal effect of all agreements, contracts, leases or franchises existing between the City of New York and the Brooklyn Eastern District Terminal, having relation to the property or any part of the property condemned or taken in this proceeding.

2. The nature, quality, character and legal effect of all estates, rights, interests or claims arising out of and by virtue of such contracts or agreements.

3. The particular rights, interest, estates and property claimed to have been taken, condemned and appropriated in this proceeding and for which compensation is claimed and demanded.

Therefore, these matters came on for trial on June 9, 1942, and after trial, the Court directed that briefs be filed by all parties in interest.

In order to envision a comprehensible picture of this particular proceeding, it will be necessary to summarize the pertinent facts involved.

The defendant, Brooklyn Eastern District Terminal, which has brought the present motion, is a domestic freight terminal company duly incorporated under Article 10-a of the Transportation Corporations Law, Laws 1911, c. 778, in November of 1915, and now under Article 8 of the same law, Consol.Laws N.Y. c. 63 in which was merged the Brooklyn Eastern District Terminal, incorporated June 22, 1908, as a navigation corporation, and the East River Terminal Railroad.

It was organized to supply, maintain and operate freight terminal facilities—including docks, wharves, bulkhead, basins, tugs, floats, lighters and other shipping and wharfage and lighterage for the receipt, delivery, storage and handling of freight, and so forth, and was situated at what is commonly known as the Wallabout Market, the area of acquisition.

The Wallabout Market property was originally acquired by the City of Brooklyn from the United States of America. When it was consolidated with the City of

New York in 1897, the latter succeeded to the title thereto. Under the terms of the original grant, the property in question was to be held in trust and used solely for and as a public market.

Prior to its agreement with the City, the Terminal maintained and operated freight terminals in the boroughs of Brooklyn and Queens, and as an originating and delivery carrier, transported railroad cars on car floats between its terminals and the terminals of all the trunk line railroads in the City.

On November 16, 1935, the Terminal made an agreement with the City (defendant's Exhibit 6). This agreement was authorized by a resolution adopted by the Board of Estimate and Apportionment of the City of New York on October 25, 1935. It was executed by the Mayor of the City of New York and attested by the City Clerk pursuant to said resolution.

This agreement granted the Terminal the right and privilege to build, provide and maintain the necessary float bridge, tracks and track appurtenances to properly equip the Wallabout Market with a public freight terminal and operate the same for the benefit of the public and other railroad corporations for the period of ten years upon certain terms and conditions. In consideration of the rights and privileges permitted, the Terminal agreed to build, install and maintain and operate certain specified improvements usually required in freight terminals to pay the City as compensation the sum of One ($1) Dollar for each loaded car received at the Wallabout Market other than cars consigned to the United States Navy Yard, and other than market produce cars of less than 28,000 pounds in billed weight, together with a sum equal to all track storage charges accruing to the Terminal pursuant to any track, storage, tariff, rule or regulation from time to time in force.

The Terminal claims to have expended in the construction of said terminal more than $110,244.47, the cost as adjusted was decreased to $101,351.77. Other sums were invested in car floats which were necessary for the Terminal to operate in the market proper. Thereafter, and until the investing of title of this area in the United States of America, the Terminal was operated and maintained in accordance with the aforementioned agreement.

The Terminal now seeks compensation for the value of the physical property taken by the United States of America by the power of eminent domain in the sum of $62,629.11 and for the estimated value of the remainder of the term of the agreement amounting to $776,958.88, or a total of $839,587.99. This includes the profits which the Terminal claims it would have made from the date of taking to the expiration date of the agreement.

The Terminal bases its claim for payment upon these grounds:

1. That it has a vested property right as holder of a franchise to improve, maintain and operate a freight terminal upon the property appropriated pursuant to the agreement of November 16, 1935.

2. That the provisions of paragraph 21 of the agreement hereinabove described do not contemplate a premature termination thereof by the exercise of the power of eminent domain.

3. That the value of this franchise must be determined from the original cost, replacement value, earning capacity and good will.

The City resists these contentions of the Terminal on the bases:

1. The contract of November 16, 1935, was authorized only by a resolution of the Board of Estimate and Apportionment. The procedure required by the provisions of the Greater New York Charter for the granting of a franchise was not followed, hence the contract could not constitute a franchise.

2. Since the right and privileges granted to the Terminal company related solely to market ways and not to public streets or highways, the contract could not constitute a franchise.

3. The acts of the parties in relation to the contract of November 16, 1935, furnish conclusive evidence that the contract was not intended by them to constitute a franchise.

4. Under the contract of November 16, 1935, the Terminal company owned no tangible property. Therefore, the contract granted at most an easement or permit which was terminated by operation of law.

The United States of America, the petitioner-plaintiff, appeared both upon the return of this motion and the trial of these issues. At the termination of the proceeding, the Court granted the Government the privilege of filing a brief. It chose not to do so, taking the position that the questions to be determined concern only the Terminal

and the City. The Court is of the opinion that their stand is sound and well taken.

The statutory requirements for the granting of a franchise at the time the agreement herein was entered into were provided for in Chapter III, Title 1, of the Greater New York Charter, Section 74, and can be epitomized as follows:

"The Greater New York Charter, § 74, provides that, before any grant of a 'franchise or right' to use any street shall be made by the board of estimate and apportionment, the following things shall be done:

"(1) A public hearing shall be held upon the petition therefor;

"(2) the board of estimate and apportionment shall make inquiry as to the money value of the franchise;

"(3) the board shall make inquiry as to the adequacy of the compensation proposed to be paid therefor;

"(4) the board shall embody the result of such inquiry in a form of contract;

"(5) the board shall hold a public hearing on the proposed contract after public notice."

Blanshard v. City of New York, 262 N. Y. 5, 186 N.E. 29, 31.

■ None of these provisions were complied with when the Terminal and the City entered into the contract of November 16, 1935. It would appear that the failure to comply with the statutory requirements indicates that the parties never contemplated the grant of a franchise. There is no question that the rights or privileges granted by the contract in no way related to public streets or highways. So-called streets in the agreement were treated as market ways and not as public streets or highways. The contract clearly indicates that the Terminal was granted no rights to any streets or highways. The contract recites that the Market was under the jurisdiction of the Department of Public Markets and the water front area was under the jurisdiction of the Department of Docks. The Terminal could obtain rights in the public streets only if it had a franchise from the City. Beekman v. Third Avenue R. Co., 153 N.Y. 144, 47 N.E. 277.

The portion of Wallabout Market concerned in this proceeding was conveyed to the City of New York by the United States by deed dated June 9, 1894, which contained the following limitation: "To Have and to Hold the above granted premises unto the said party of the second part (The City of Brooklyn), its successors and assigns forever, for the uses and purposes in said Act of the Congress of the United States mentioned and set forth, to wit, for market purposes and for slips, canals and piers, and other public works, in connection with such market purposes * * *."

■ The streets (so-called) in Wallabout Market were never laid out on the official Map of the City of New York, as highways or streets. The Greater New York Charter Sections 438 and 439 require this condition before dedicating a street to public use. This leads to the conclusion that the Terminal could not have received any grant or rights to the public streets because manifestly there were none.

In proceedings before the State Tax Commission in which the Terminal protested against a proposed special franchise tax assessment, it vociferously urged that the contract of November 16, 1935 was not a franchise. It took the position that a special franchise tax could not be assessed against it because the property constructed under the contract was not upon public streets or highways. The State Tax Commission ruled in favor of the Terminal and held that the Terminal was not liable for a special franchise tax assessment.

Having procured this favorable ruling by persuasive arguments, the Terminal now seeks to nullify that determination before this Court in its contention that the contract of November 16, 1935 constituted a grant of a franchise.

Upon application by the Terminal for the certificate required by Section 107 of the Transportation Corporations Law, Consol.Laws N.Y. c. 63, before the Public Service Commission and the Transit Commission, both of these Commissions refused to grant the certificate on the ground that the so-called streets were not public streets or highways but were market ways held by the City in its proprietary or corporate capacity. This denial of the certificate certainly apprised the Terminal of the fact that its contract, dated November 16, 1935, did not constitute a franchise.

If the agreement hereinabove referred to had been a grant of a franchise, the Terminal could not have legally operated without obtaining the approval of these two Commissions.

This is strongly suggestive of the fact that the Terminal was again apprised of the fact that it did not have a franchise.

The agreement is not indefinite nor uncertain and it clearly expresses the intent of the parties. The agreement made the Terminal the agent of the City to operate this freight terminal.

The contract was terminated and brought to an end by the power of eminent domain, thus constituting a termination of the agreement by operation of the law; not by any act on the part of the City of New York.

No other conclusion can be reached by this Court than that the agreement of November 16, 1935, was not a franchise and the Terminal therefore has no interest in real property and consequently is not entitled to compensation.

Private property is not the subject of a franchise. A franchise relates to the use of public property such as streets or highways. In Blanshard v. City of New York, 262 N.Y. 5, at page 10, 186 N.E. 29, 30, it was observed:

"Section 18 of article 3 of the Constitution provides that the Legislature cannot authorize any railroad to operate in a particular street of a city. The city must give its consent as well as the property owners. To this consent the city may annex such terms and conditions as it pleases. Matter of Quinby v. Public Service Commission, 223 N.Y. 244, 119 N.E. 433, 3 A.L.R. 685; People ex rel. South Shore Traction Co. v. Willcox, 133 App.Div. 556, 118 N.Y. S. 248, affirmed 196 N.Y. 212, 89 N.E. 459.

"This consent is not such a franchise as calls for action by the people through the Attorney General whenever it has been granted contrary to law.

"'We said in Beekman v. Third Avenue R. Co., 153 N.Y. 144, 152, 47 N.E. 277, 278: 'The use or occupation of the streets for such purposes, without the grant or permission of the state through the legislature, constitutes a nuisance, which may be restrained by individuals injuriously affected thereby. Fanning v. Osborne, 102 N.Y. 441 (7 N.E. 307). The city authorities have no power to grant the right except in so far as they may be authorized by the legislature, and then only in the manner and upon the conditions prescribed by the statute. Davis v. Mayor, etc., 14 N.Y. 506, (67 Am.Dec. 186); Milhau v. Sharp, 27 N.Y. 611, (84 Am.Dec. 314); People v. Kerr, 27 N.Y. 188. * * * *

"'The legislature, however, in virtue of its general power over municipalities, may regulate the mode and manner in which such consent shall be given by the authorities having the control of the street, and may prescribe the conditions upon which it may be given, and all these matters have been regulated by statute. (Laws 1892, chs. 306, 676; Laws 1893, ch. 434). * * *'"

It is well established that a valid franchise can be granted only when the provisions of Section 74 of the Greater New York charter are complied with in every respect. See Ghee v. Northern Union Gas Co., 158 N.Y. 510, 53 N.E. 692; Greenberg v. City of New York, 152 Misc. 488, 274 N.Y.S. 4; Loos v. City of New York, 257 App.Div. 219, 13 N.Y.S.2d 119; City of Long Beach v. Public Service Commission, 249 N.Y. 480, 164 N.E. 553; People ex rel. Barron v. Knapp, 208 App.Div. 127, 203 N.Y.S. 76; and Nellis v. Munson, 108 N.Y. 453, 15 N.E. 739.

People v. O'Brien, 111 N.Y. 1, at page 41, 18 N.E. 692, 699, 2 L.R.A. 255, 7 Am. St.Rep. 684, distinguishes between a franchise and a mere license or privilege during the lifetime of the grantee and revocable at the will of the State. It goes on to say:

"It is, however, earnestly contended for the state that such a franchise is a mere license or privilege, enjoyable during the life of the grantee only, and revocable at the will of the state. We believe this proposition to be not only repugnant to justice and reason, but contrary to the uniform course of authority in this country. The laws of this state have made such interests taxable, inheritable, alienable, subject to levy and sale under execution, to condemnation under the exercise of the right of eminent domain, and invested them with the attributes of property generally.

"We will refer to a few of the statutes on this subject, from which the implication arises not only that the state intended to invest these franchises with the character of property, but also to enable their mortgagees, purchasers, and assigns to enjoy their use under an indefeasible title."

It is manifest that this Terminal can only be compensated in the event it is found that the agreement of November 16, 1935, constitutes a franchise. The facts strongly

indicate otherwise. The decisions reviewed in this opinion and others cited preclude such a finding.

The cases cited by the Terminal under its "Point I" are clearly distinguishable from the case at bar, for in these cases were involved rights and privileges granted in connection with agreements to operate over public streets. For example, in People v. State Board of Tax Commissioners, 126 App.Div. 610, 110 N.Y.S. 577, there was a special franchise to construct a railroad over and upon public streets and it was held that the franchise consisted of the physical property. See also People ex rel. New York C. & H. R. R. Co. v. Gourley, 198 N.Y. 486, 492, 92 N.E. 398.

In the present proceeding, the car floats et cetera were not upon public streets or highways but upon market ways.

In Eighth Ave. Coach Corp. v. City of New York, 170 Misc. 243, 10 N.Y.S.2d 170, the rights of the holder of a ten year bus franchise were involved. Here again public highways were being used, and the authority is not applicable to the case at bar.

Furthermore, the Terminal is strangely silent as to the position it took when proposed tax assessments were about to be levied. The facts reveal that during the years of its operation the Terminal maintained that it did not have a franchise and was not subject to tax assessment and that contention by them was upheld. It now argues that it has a franchise for which it should be compensated. These divergent positions place the Terminal in an awkward state but the stand they now seek to substantiate is understandable for they are endeavoring to "eat their cake and have it too."

Paragraph 21 of the agreement between the Terminal and the City, dated November 16, 1935, provides in substance that the float bridge, float bridge protector rack, float bridge dock approach and tracks, erected by the Terminal, shall upon expiration or sooner termination of the agreement revert to and become the property of the City of New York without compensation to the Terminal. In the opinion of this Court, this is indicative of the fact that the Terminal is not entitled to any compensation especially upon the termination of the agreement by an act other than that of the City of New York.

■ The paragraph in question also clearly shows that the City of New York did not intend nor did the Terminal have the impression that a franchise was granted.

The Terminal cites many cases with respect to leases and the damages to be awarded when a leasehold is terminated by condemnation. Unfortunately for the Terminal, the agreement of November 16, 1935, is not a lease. The contract merely designated the Terminal the agent of the City to operate the Terminal during a specified time. The power of eminent domain caused a cessation of the right to operate the terminal and therefore this agency was at an end.

Under the provisions of paragraph 21 and other subdivisions of the agreement, the Terminal was not entitled to compensation for the termination of the agency unless its rights were terminated in some way by an act on the part of the City of New York.

■ As a matter of law, structures erected upon the land of another, in the absence of an agreement to the contrary, immediately become the property of the fee owner. Village of St. Johnsville v. Smith, 184 N.Y. 341, 77 N.E. 617, 5 L.R.A.,N.S., 922, 6 Ann.Cas. 379; In re City of New York, 159 Misc. 741, 289 N.Y.S. 433; People ex rel. Hudson River Day Line v. Franck, 257 N.Y. 69, 177 N.E. 312.

In People ex rel. Bear Mountain Hudson River Bridge Co. v. Diamond, 126 Misc. 239, 213 N.Y.S. 258, 261, it was said: "It is a well-settled rule that a building or other structure erected upon the land of another becomes a part of the land, and is taxable as a part of the realty, unless there is a right of removal reserved by express agreement or by implication of law."

The agreement of November 16, 1935, did not contain an express reservation of title in the Terminal to the structures and appurtenances; nor did it reserve the right to remove such structures at the expiration of the term of the contract.

The argument is advanced by the Terminal that it had some property rights pursuant to the agreement for which it should be compensated.

This Court has concluded that it had no franhcise. It has found that the Terminal had no lease. The veiled suggestion is made that the contract might reach the proportion of the right of easement. This view is untenable since the Terminal had no property rights. The structures it erected upon the land of the City in the absence

of any agreement to the contrary immediately became the property of the fee owner upon condemnation by the government, the United States of America. Therefore, based upon the agreement of November 16, 1935, compensation cannot be awarded to the Terminal. Equitably, it is perhaps unfortunate for the Terminal that it cannot be compensated in some manner for these structures but that is the fault of the terms of the agreement.

Upon the making of the contract, the Terminal was evidently anxious and willing to enter into the agreement in view of the large and lucrative profits it would immediately make and continue to enjoy. Perhaps this anxiety somewhat blinded the Terminal as to the possible termination of this agreement by operation of law. In any event its right to compensation must be determined by the terms of the agreement.

The Court must therefore find that the Terminal is not entitled to compensation and judgment must enter in favor of the City of New York.

Settle order on notice.