**Clark C. NYE, Appellant,**

v.

**Edwin M. LOVELACE, Appellee.**

**No. 15555.**

United States Court of Appeals
Fifth Circuit.

Jan. 11, 1956.

C. Harold Thweatt, Oklahoma City, Okl., Ralph G. Holberg, Jr., Albert J. Tully, Mobile, Ala., Holberg, Tully & Aldridge, Mobile, Ala., Embry, Crowe, Tolbert, Boxley & Johnson, Oklahoma City, Okl., of counsel, for appellant.

William G. Caffey, Mobile, Ala., Caffey, Gallalee & Caffey, Mobile, Ala., of counsel, for appellee.

Before RIVES, JONES and BROWN, Circuit Judges.

BROWN, Circuit Judge.

Appellant Nye, an Oklahoma oil investor, in the spring of 1951 made arrangements through his agent, Tom Gorton, with the appellee, Lovelace, to procure mineral interests in an area later on known as the Pollard Field in Alabama. The last transaction was concluded August 16, 1951. Later on, perhaps inadvertently, Nye learned that Lovelace had purchased in his own name and held for his own account one-half of the minerals under 40 acres known as the Gray tract. In pre-trial discovery deposition in Nye's suit to recover the Gray tract, Nye learned, for the first time, that in procuring the mineral acreage Lovelace, instead of drawing on Nye's account for actual cost, had treated each of the transactions as though it were a purchase by him from the landowner and a resale to Nye at substantial profits totaling over $2500.00.

After a full trial, the court made a finding having, to us, extraordinary and dominant significance. The court rejected Lovelace's contention that his engagement was to get together such acreage within the outlined area on the best terms obtainable to himself and then submit them to Nye's agent, Gorton, at a mutually acceptable price, the difference to be his compensation. In so doing, the court adopted altogether Nye's contention that Lovelace's compensation was to be his out-of-pocket expenses and an interest, later to be determined, in specific minerals. Additionally, without ever informing Nye or Gorton, Lovelace purchased the Johnson tract, admittedly within the designated buying area, for his own account. This means that from the very outset Lovelace was, and continued to be, an unfaithful servant who sought private gain to the detriment of his principal. The district court required Lovelace to repay the withheld profits and convey the Johnson tract. Lovelace has acquiesced in both.

But not so as to the Gray tract. The trial court held that this was properly purchased by Lovelace for his own account since it lay outside the designated buying area, and its purchase was not necessary to the acquisition of interests within the area. And this, even though Gray was purchased from the same person (Hart) and simultaneously with the Crosby tract, one concededly within the agency. We cannot agree.

In the beginning Nye furnished to Gorton, and through him, to Lovelace a plat on which lines, following strictly the perpendiculars of sections, were traced outlining the area in which minerals were desired. Nye had confidential information as to the location of a test well (later dry) and the area, roughly 7 miles in width east and west and 1½ miles in depth north and south, ran generally northwest to southeast in stair-step fashion roughly paralleling the supposed location of a fault. Offsetting the well-site, in part, in the adjacent section was the Crosby tract, owned in equal one-third shares by James Hart and two other partners. Since Lovelace acquired the Gray tract when procuring Hart's interest in Crosby for Nye, the full history of the dealings for Crosby is important.

The Crosby tract, contiguous but irregularly shaped, approximated 1260 acres, only 400 of which were within the designated buying area. In dissolution of the partnership, the Crosby tract was being sold, ½ of the minerals being reserved which gave Hart a ⅙th interest. According to Lovelace, he obtained about June 1951 an offer from the three partners for ½ of the minerals at a cost [1] to him of $4500.00 which, it is uncontradicted, he submitted to Gorton for $6000.00 which was declined because of the high cost in terms of limited attractive acreage. A month or so later, Nye's interest in acquiring Crosby was revived, and Lovelace, either by a chance

---

1. See footnote 3, *infra*, for Lovelace's difficulties in explaining how he arrived at this figure.

meeting of Hart on the street, or through a telephone conversation between Thomas McMillan and Hart, relayed to him, learned that Hart was willing to sell the interest previously discussed. Only the Crosby tract was mentioned. In the meantime, Thomas McMillan, one of Hart's partners and an attorney, informed Lovelace that he understood Hart also owned the Gray tract, a ¼ ¼ section contiguous to Crosby and diagonally offsetting the well-site and suggested that perhaps Hart would like to sell a part of this as well. With no further discussion, Lovelace had his attorney (his brother) prepare two separate deeds, one covering a 1⁄12 interest in 960 acres of the Crosby tract to comprise 80 mineral acres, the grantee being left blank, and one with Lovelace as the grantee covering ½ of the minerals in the Gray tract comprising 20 mineral acres. On that same day, August 7, Lovelace took the deeds to Hart's farm where they were executed by Hart and his wife separately. The conversations at Hart's farm concerning the Gray tract vary as between Hart and Lovelace, but in substance it was that the deeds had been prepared to cover an interest in the Crosby and also the Gray tract, Hart assuming that reference to the "same interest" indicated a 1⁄12 in Gray as well as Crosby, and Lovelace remaining substantially silent in words on that point, conscious that the deeds, on their face, reflected the 1⁄12 and ½ interest in each, respectively. Hart, in payment, received Lovelace's personal check in the amount of $900.00. For the 80 mineral acres in Crosby, Lovelace drew on Nye the next day for $1400.00. Hart claims not to have read either deed and a producing well had come in before Hart apparently realized that he had sold ½ of his minerals in Gray.

Notwithstanding the unusual circumstances of this closing, the trial court placed great reliance on the fact that, since the Gray tract happened to be just outside of the lines on the plat, Nye had himself excluded it from the buying area even though he knew it was a physical, diagonal, offset to the well-site. The court recognized, however, that it could not automatically exclude from the agency all land outside of the designated buying area, since so much had been, and had to be, procured beyond it to acquire interests within it. In the trial court's view, the outside acreage was within the agency only when necessarily procured in a single transaction as a condition to acquiring acreage within the area. On this approach the court then held that these were two separate transactions, separately negotiated so that procurement of Gray was wholly unrelated to acquisition of the desired interest in Crosby.[2]

To reach this conclusion was, we think, to reject the clear evidence from Lovelace and Hart and ignore the plain implication of this total circumstance. To be sure, there were two separate pieces of paper, but the total absence of any prior negotiations or discussions on Gray, the preparation of formal deeds covering land not previously discussed, the calculation of fractional interests in both so that they totaled precisely 100 mineral acres previously discussed and the calculation of the amount payable, all combine to make it clear that it was Lovelace's purpose to wrap it all up in one package.[3]

**2.** "From the circumstances surrounding the purchase of the two tracts, it appears clear that they were separately negotiated. There was no discussion relative to the Gray tract until the defendant's visit to conclude the purchase of the Crosby tract * * * the court is mindful of the testimony of Hart to the effect that the sale of both tracts was one transaction; but on a detailed analysis of his testimony, this seems to be merely Hart's conclusion, without substantial basis in fact."

**3.** Lovelace categorically admitted: "Q. Did you ever attempt to trade with Hart for the John Gray interest on a separate basis? A. No, sir."

According to Hart, the initial offer in June was to purchase from him, and a

Disregarding Lovelace's subjective attitude whether this was one or two transactions and the factual conflict between Hart and Lovelace on whether the original trade was for 100 acres or something more or less, it is uncontradicted that so far as Hart was concerned, it was a common transaction, whether in one or two parts, or more, and under no circumstance would he have sold the Gray tract had not he been selling Crosby.[4] While the trial court rejected, as Hart's conclusion, his insistence that it was one transaction, the court did not, could not, find that had Lovelace approached him solely to procure Gray, he would have made the trade for the equivalent of $180.00. Everything about the course of dealing between Lovelace and the owners of Crosby bespeaks the recognition by Lovelace that these people were not going to permit a purchaser to pick and choose the good and reject the bad. Requiring Lovelace to take 560 acres of Crosby outside the designated area to procure the interest in 400 within makes practically absolute Hart's assertion that Gray would not have been sold alone.

The trial court, we think, became so preoccupied with the notion that Hart did not require purchase of Gray as a condition precedent to delivery of Crosby, that the vital importance of Hart's unwillingness to sell Gray unless they bought Crosby completely escaped him. This meant that the opportunity to procure a valuable interest in Gray was due entirely to Lovelace's position as agent for Nye. It was not simply the case of an agent acquiring knowledge of an attractive opportunity through performance of the master's work. When the door was opened solely because of Lovelace's dealings for his principal—when the only way to exploit the collateral opportunity was to consummate concurrently the principal's transaction—he was under an obligation to tender the coincidental benefits to his principal or at least advise him of his personal tentative interest in it. It is not for the agent to determine for the principal whether the fruits are, or are not, attractive or desired, nor is it open to the servant under his heavy obligation of high fidelity to analyze, in reverse, what must have been in his principal's mind at the time the general outline of the area was made, or to determine that, because the particular tract was separately owned under a title unrelated to the larger purchase, the principal would adhere

---

like amount from his partners, 100 mineral acres for a total of $900.00. Lovelace denies this, but, though pressed, he was never able to explain how he arrived at $4500.00 for ½ of the partnership's minerals in the entire Crosby tract (if 1260 acres it would net $5670.00; if 1100 acres, $4950.00). Nor could he explain how he happened to fix 80 mineral acres in Hart's Crosby deed which, on its face, covered but 960 of the 1260 acres. He suggested that he excluded all but that in sections 12, 13 and 24, because it was so remote from the well-site, but it was a suspicious circumstance, at best, that only by reducing Crosby acreage to 960 would the ½ interest conveyed (½2) equal 80 mineral acres leaving 20 acres to be made up by ½ of the minerals in Gray. The careful preparation of deeds, without prior discussion on mechanics as between Gray and Crosby, to make exactly 100 acres reflects Lovelace's knowledge that Hart had agreed, and was expecting, to sell 100 mineral acres. Likewise, from Lovelace's viewpoint, his intention to consummate a "100 acre—$900.00" deal was manifested when, inadvertently writing the payment check for $800.00, he discovered his error, destroyed that check, and issued one for $900.00 to carry out the trade originally made for $4.50 an acre (for ½ interest, $9.00 for full interest).

4. "Q. Mr. Hart, would you have sold your interest in the minerals in the Gray Forty * * * if you had not been paid the full $900.00? Would you have sold those minerals without selling under the Crosby tract, too? A. I would not intend to sell those at all. Q. Would you have sold your minerals under the Gray Forty for $180.00 if at the same time he had not paid you $720.00 for minerals under the Crosby tract? * * * A. No, sir, I would not have sold them."

to the strict artificial lines of the area instead of acquiring, as was otherwise frequently done, interests in the seller's outside acreage.[5]

Here, an unfaithful servant, whose activities from the inception were in breach of his heavy duties, undertook, with circumstances strongly suggesting a studied furtiveness, to capitalize upon the information which had come to him under an obligation of trust, and in doing so, he sought to make decisions and resolve questions for his principal in which he stood to gain or lose as self-interest prevailed or was submerged. That which he has obtained by these means, he must restore.[6]

As we think the total record is an overpowering portrayal of an agent unfaithful to his trust, the denial by the trial court of equitable relief to recapture the diverted fruits of his actions leaves us with the conviction that an injustice has been done and a mistake has been committed, United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746, 766; Galena Oaks Corp. v. Scofield, 5 Cir., 218 F.2d 217, 219; Special Service Co. v. Delaney, 5 Cir., 172 F.2d 16, 19; Sanders v. Leech, 5 Cir., 158 F.2d 486, 487; Gasifier Manufacturing Co. v. General Motors, 8 Cir., 138 F.2d 197, 199; Drew & Co. v. Reinhard, 2 Cir., 170 F.2d 679, 684, and the judgment, insofar as it concerns the Gray tract, must be reversed and rendered in favor of appellant, Clark C. Nye. Reversed and rendered.

"Q. Mr. Hart, when you sold them, were you making one trade or two trades?

"A. Making one trade at the time of the discussion * * *."

5. Nye had to take much outside acreage. On completion of trading, approximately thirty-four 40-acre tracts were within the lines and forty-four outside. To obtain the Stewart minerals (320 acres adjacent to and including the well-site), Nye had to take approximately twenty-seven 40-acre tracts scattered as far as 2 miles north, 2 miles east, and 2 miles south of the well-site.

6. Hunter v. Shell Oil Co., 5 Cir., 198 F.2d 485; Pratt v. Shell Petroleum Corporation, 10 Cir., 100 F.2d 833; Russell v. Republic Production Co., 5 Cir., 112 F.2d 663. See also McKinley v. Williams, 8 Cir., 74 F. 94; Rice v. First National Bank in Albuquerque, 50 N.M. 99, 171 P.2d 318; Young v. Bradley, 6 Cir., 142 F.2d 658; Restatement of Agency, § 381, Comment (a) (d); Restatement of Agency, § 387; Hammond v. Bookwalter, 12 Ind.App. 177, 39 N.E. 872; Trice v. Comstock, 8 Cir., 121 F. 620.