Bill J. BISHOP and Joseph R. Haynen, Appellants,

v.

UNITED STATES of America, Appellee.

No. 17374.

United States Court of Appeals Fifth Circuit.

May 13, 1959.

Rehearing Denied June 18, 1959.

2. Di Carlo v. Pacanins, D.C., 164 F.Supp. 841.

Wilford W. Naman, Naman, Howell & Smith, Waco, Tex., Sam H. Amsler, Jr., McGregor, Tex., for appellants.

Maurice S. Meyer, Atty., Dept. of Justice, Washington, D. C., Carl Mason, Asst. U. S. Atty., Land Acquisition Section, Waco, Tex., Russell B. Wine, U. S. Atty., San Antonio, Tex., George Cochran Doub, Asst. Atty. Gen., Alan S. Rosenthal, Atty., Dept. of Justice, Washington, D. C., for appellee.

Before HUTCHESON, Chief Judge, and CAMERON and BROWN, Circuit Judges

JOHN R. BROWN, Circuit Judge.

The disposition we make of this case dispels many of the intricate and somewhat troublesome procedural questions dealt with by the parties. In brief, this is a run-of-the-mill condemnation

suit in which the Government in 1954 took—really took back—specified portions of Bluebonnet Ordnance Plant near McGregor, Texas, which it had sold to the claimant, Bill J. Bishop, in 1949.

In any case, that is the way it started. But after final judgment awarding the claimant $185,000 (less certain agreed credits) for the property, indeed after the Government had acquiesced in that judgment by formally dismissing its appeal and depositing the balance of the judgment in the Registry, it sought—and has so far succeeded—in getting out of paying *anything*, on the ground that the original conveyance in 1949 from the Government to Bishop was infected with fraud. This is so, it contends, because Joseph Haynen, now admittedly a partner of Bishop and interested in the property, was then an employee of the War Assets Administration Regional Office in Dallas and was, in fact, the secret, silent partner of Bishop in breach of Haynen's duty of undivided fealty.

On the very last day of the one-year period permitted under F.R.Civ.P. 60(b) (3), 28 U.S.C.A. the Government filed what it called an "Amended and Supplemental Complaint." In it was set forth the facts to establish this infidelity. The relief provided by F.R.Civ.P. 60(b), of course, is merely to set aside a judgment. But that sought by this paper did not stop there, nor did the Court in the relief finally granted. Over the vigorous protests of the claimants (Haynen had since been made a party defendant) that all that rightfully could be done at that stage was to set aside the judgment, the Government sought, and the Court granted, far-reaching relief. The result was that what had started out as a simple condemnation suit had been turned into

a proceeding by which the original deeds to Bishop were effectively rescinded and he was categorically ordered to account for all revenues, income, profits and proceeds from the use, sale or other disposition of the properties from the date of the purchase in 1949.

 Obviously what was granted was not within the permissible scope of F.R. Civ.P. 60(b). There was a judgment casting the Government for $185,000. It was final. It had adjudged the record fee ownership in Bishop and had fixed just compensation. Even if we assume that fraud, actual or constructive, in the initial conveyance seven years before could infect the judgment and not merely the underlying transaction itself, setting aside that judgment would not have given all of this other relief. Setting aside the condemnation judgment would have left the Government's complaint, the claimant's intervention and Answer and, perhaps the Commissioner's report together with the Government's exceptions to it. In short, it would have left a condemnation suit open and undisposed of. It would have left ownership of the property as it was on the commencement of the condemnation action. An open and undisposed of condemnation suit is the mechanism by which the Government seeks to acquire property by ascertainment and payment of Fifth Amendment just compensation. It is patently not the mechanism for the assertion that the Government really *owns* the full beneficial title. Neither United States v. Turner, 5 Cir., 1949, 175 F.2d 644, certiorari denied 1949, 338 U.S. 851, 70 S.Ct. 92, 94 L.Ed. 521, nor any of the other numerous cases [1] urged by the Government would bring this about.

---

1. They cite amongst many others United States v. 83.94 Acres of Land, D.R.I., 1946, 65 F.Supp. 843, affirmed sub nom. Smythe v. United States, 1 Cir., 1948, 169 F.2d 49; United States v. 53¼ Acres of Land, D.C.E.D.N.Y., 1942, 47 F. Supp. 887, 889, reversed on other grounds, Brooklyn Eastern Dist. Term. v. City of New York, 2 Cir., 1944, 139 F.2d 1007, certiorari denied, 1944, 322 U.S. 747, 64 S.Ct. 1158, 88 L.Ed. 1579; Washington Water Power Co. v. United States, 9 Cir., 1943, 135 F.2d 541, certiorari denied, 1943, 320 U.S. 747, 64 S.Ct. 50, 88 L.Ed. 444; Swanson v. United States, 9 Cir., 1946, 156 F.2d 442, 170 A.L.R. 258, certiorari denied, Spokane Portland Cement Co. v. Swanson, 1947, 329 U.S. 800, 67 S.Ct. 492, 91 L.Ed. 684.

Manifestly then, affirmative action, apart from the highly specialized condemnation proceeding under F.R.Civ.P. 71A was essential. We mention this not to hold that the Court was in substantial harmful error in the manner it went about the hearing on this "Amended and Supplemental Complaint," for we never really reach this. We mention it because it emphasizes sharply the real nature of the Government's *new* claim.

This was the serious charge, requiring substantial proof resting on clear and convincing evidence and not mere suspicion, that this long-time respected employee of the Government, who had discharged heavy responsibilities in an exemplary fashion had, for the sake of speculative profit in the possible later sale of property which the Government had not been able to dispose of in three years, become the faithless servant. The confusion in the Court's mind, the uncertainty in just what was being, or could be, done or tried under this equivocal proceeding, obscured the basic problem. It accounts, we think, for the failure of the Court to evaluate perceptively the lack of real evidence having qualities of inherent trustworthiness showing that Haynen was a partner, or had or would have, an interest in the property *to be* bought by Bishop.

The inadequacy of the total evidence to sustain the crucial findings of the Court can best be demonstrated by analyzing the case against the dramatic and extravagant claims of the Government's brief. In this phase of the case the Government's brief starts out with this claim. " * * * [T]he evidence fully establishes: (1) a gross violation by Haynen of his fiduciary obligation to War Assets Administration; (2) that Haynen and Bishop conspired to misrepresent the transaction to War Assets Administration; (3) that they deceived and defrauded War Assets Administration and induced it to approve Bishop's bid and sell the property to him * * *

Haynen was the guiding hand in the entire transaction." Again, the brief pulls all stops. " * * * [A]ll the evidence impels the conclusion that [Haynen] and Bishop planned to acquire the property for some time prior to the bidding and that they took every covert step necessary to secretly acquire the property and to methodically conceal Haynen's interest * * *. Haynen, with the advantage of his professional knowledge of the equipment, his experience in disposals, his special knowledge of the specific property, and his ability to assess its marketability in likely industries, was in a uniquely strategic position to know how the bonanza could best be realized. In this posture, he withheld his skill and knowledge from his principal, and furtively diverted it to his own self-interest. * * *." The brief ends with an equal flourish. "The facts * * * establish a clandestine trick, scheme and device whereby the defendants falsely represented that the bid was made by and on behalf of Bishop alone to induce War Assets Administration to approve the bid * * *."

At the outset, it is acknowledged that Bishop had the right to buy the property. He was, to be sure, a former employee of War Assets Administration as Assistant Chief of the Property Maintenance Division in the Dallas Regional Office. But he had left the service in a reduction of personnel on February 18, 1949. Whatever knowledge he had gained during his official employment about these properties, the real or potential values or prospective uses of them, was his to exploit to the fullest. His prior employment or any unique knowledge that may have given him did not restrict in any way his right to submit his bid of May 30, 1949, or his right to buy the property if successful.

Haynen, on the other hand, was a Government employee until September 2, 1949, at which time his employment was terminated on a reduction in force.[2] He was, and had been for a con-

---

2. Haynen was technically on "annual leave" status from September 2 to November 23, 1949 and "furlough" status from November 23, 1949 to August 17, 1950. Although his annual leave was payable in a lump sum, he was not paid,

siderable time, Chief, Property Management Division of the Regional Office, War Assets Administration, and was therefore Bishop's superior. As such, he had responsibility for about a half a billion dollars worth of Government property in this five-state region, and direct supervision of 1,000 employees. Though the Property Management Division was administratively separate from the Industrial Disposal Division, Haynen's position required that he serve on the Regional Review Board to review bids for the purpose of recommending their acceptance by Washington.[3] Because of this it is frankly acknowledged, as indeed it must be, that absent full disclosure, Haynen was disqualified as a purchaser or bidder or as one interested financially in a bid or purchase. On long-accepted notions of fidelity he could not have a personal interest in a pending or proposed purchase, and if he did, the property and its fruits must be restored to the principal wholly without regard to actual evil conduct, misrepresentation or concealment on the part of the unfaithful servant, or actual damage and injury on the principal's part.[4]

It bears emphasis here, however, that while the law—out of the demands of morality and equity—rightfully imposes this heavy trust on the property and the faithless agent, the resulting legal incidents do not serve either to establish the unfaithful act or, as charged here, that it was consciously done with furtive, though awkward, clumsy stealth.

The Government asserts "Haynen was the guiding hand in the entire transaction" and "he and Bishop planned to acquire the property for some time prior to the bidding." Then the brief reaches this climax. " * * * Haynen, with the advantage of his professional knowledge of the equipment, his experience in disposals, his special knowledge of the specific property, and his ability to assess its marketability in likely industries, was in a uniquely strategic position to know how the bonanza could best be realized."

It is neither subtle, accurate, nor convincing for the Government to talk about a bonanza, or a bonanza known best only to Haynen, or that to exploit it Haynen was the master mind in the decision to *bid*. What was this bonanza? Who, other than Government lawyers five years later from their remote position, thought it to be such? Not the War Assets Administration. Its official reports, recommendations, reviews on bids, and other records, both in Dallas and in Washington, show that three years' strenuous efforts to dispose of this property had been unavailing. The properties were rundown, generally unusable and located so far out in the country as to have little utility. The property involved was for (a) Load Line 4, (b) the Ammonium Nitrate Line, and (c) Bomb Booster Line of this World II Ordnance Plant. The last sales effort was the advertisement for bids in April 1949. Bishop submitted a bid for (a) and (b) separately and a

of course, while on "furlough" status. While "furlough" status generally carries with it some suggestion of the possibility of reinstatement, this was improbable under these circumstances, and in fact the Civil Service told Haynen upon inquiry that there was "little possibility" of his being recalled.

3. For complete understanding it is helpful to summarize the disposal procedures of the War Assets Administration. The Industrial Disposal Division of the Dallas Regional Office received the bids. These were sent, with recommendations, to the Regional Review Board of which Haynen was a member. If the Regional Review Board recommended acceptance

of a bid, it would be returned to the Industrial Disposal Division. The Regional Director would then send the bids and recommendations to the General Board of the War Assets Administration in Washington. There it would be acted upon by the Industrial Disposal Division and the Appraisal Division of the War Assets Administration for final approval.

4. The Government stresses Robertson v. Chapman, 1894, 152 U.S. 673, 13 S.Ct. 741, 38 L.Ed. 592, and our opinions in Nye v. Lovelace, 5 Cir., 1956, 228 F.2d 599, and Hunter v. Shell Oil Co., 1952, 198 F.2d 485. See also Restatement (Second), Agency §§ 387–398 (1958).

combined bid for (a), (b), (c) of $51,500. His bid on (a) and (b) substantially exceeded all others, and for (a), (b) and (c) it exceeded the next highest combined bid by $19,000. His bid was on the basis of 10% down and 20 years to pay. On June 1, 1949, the Regional Board, with Haynen a member, voted unanimously to request Bishop to submit a revised bid for (a), (b) and (c) in the same amount but for 20% down and 10 years to pay. Bishop agreed.

In the meantime Hill, a bidder on (c) —Bomb Booster Line—complained that his bid of $6100 was highest. As Bishop had not bid on this separately, and his separate bids on (a) and (b) when added to Hill's would aggregate $52,200 ($700 more than Bishop's combined bid), the Regional Review Board reconsidered on June 10. The Board, Haynen participating, voted unanimously to withdraw (c) from Bishop's bid. It next voted, Haynen and one other dissenting, to recommend acceptance of Hill's separate bid for (c). Bishop, however, had since made clear that he would not take the property unless he got (a), (b) and (c).

Despite Bishop's adamant position, the Regional Director on June 14, on the recommendation of the Regional Board, recommended to Washington that (a) and (b) be sold to Bishop for $46,100. What was being recommended was, then, a sale which the Regional Review Board, of which Haynen was a member, and the Regional Director, who had his own individual command responsibility, knew would not be accepted by the bidder. On June 16, the Regional Director recommended the sale of (c) to Hill unless it were to be rejected if to complete sale to Bishop he would insist on (a), (b) and (c). The matter was independently reviewed in Washington. The papers show that special care was given because it was known that the bidder, Bill Bishop, was a former employee and the agency properly wished to avoid any possible criticism. This included a detailed reappraisal by the Appraisal Division. This independent appraisal [5] showed an original cost value of $3,411,411 and a "fair value" of $190,839.

With full knowledge that on its own independent appraisal the property had a "fair value" of nearly $200,000, the Industrial Real Estate Disposal Division of the Administration's Washington office recommended to the General Board that the bid of Bishop be accepted as the highest and best obtainable. In this recommendation it referred to the report [6] of the Regional Director, the ab-

---

5.

| | Fair Value | Original Cost |
|---|---|---|
| "[a] Load Line 4 | $ 65,255 | $1,756,957 |
| [b] Ammonium Nitrate Line | 107,974 | 1,264,366 |
| [c] Bomb Booster Line | 17,610 | 390,088 |
| Total | $190,839 | $3,411,411" |

6. "The entire facility has heretofore been advertised for use in place. No sales were made as the result of advertising. * * * Many contacts were made with prospective purchasers for industrial sites for on-site use. In most cases no interest was evidenced whatever. In a few cases, offers were obtained in amounts so low as not to warrant consideration. * * * The property has been available for sale almost three years. The select part of the facility has been disposed of as enumerated above. The remaining portion is the most undesirable, especially the buildings and as to location within the original Bluebonnet site. There is no local fire protection so that a prospective purchaser must anticipate depending upon the City of McGregor to furnish such protection. * * * The buildings are so constructed as to be almost one-purpose buildings. An expensive repair and alterations program would be required if a purchaser intended to use them for a manufacturing plant or other permanent business."

solute accuracy and reliability of which was vouchsafed by every Government witness.

This completely dispels any suggestion or implication that Haynen deprived the Government of any peculiar knowledge about the value of this property or the prospective or speculative uses of it, or the disposal or sale of removable items. Indeed, the terms of the bid and acceptance reflect that, except for those portions subject to the National Security Clause, it was known that much of the property would have to be sold or disposed of for off-site use.

Moreover, these official records show that the Washington headquarters of the War Assets Administration was anxious not to lose this trade. Bishop had represented that a likely use would be for grain storage under contract with Commodity Credit Corporation. The Washington office contacted appropriate persons in CCC's office who not only confirmed this, but urged acceptance of Bishop's bid at the earliest time. This interdepartmental negotiation reflected that Bishop's rental storage receipts from CCC would be about $7,000 per year, an amount approximating the down payment and hence inferentially the basis for some financing.

In this record of extreme caution, exercised both at Dallas and in Washington because of Bishop's prior employment, there is not a single stitch of evidence to support the serious charge which the Government, in a cavalier fashion, makes that Bishop and Haynen " * * * *induced* [War Assets Administration] to approve Bishop's bid and sell the property to him." With a similar lack of *any* evidence the Government at once claims the right to get for nothing property valued in 1954 at $185,000 and, at the same time, brand its longtime servant a faulty and faithless one by this assertion which is completely unproved, "In this position, [Haynen] *withheld* his *skill* and *knowledge* from his principal, and furtively *diverted* it to his own self-interest."

These charges that by conscious misconduct of Haynen the Government was led to make a trade which it otherwise would not have made having failed to withstand careful scrutiny, what is left? Nought but the claim that the circumstances of the loan of $515 on May 27, 1949, by Haynen to Bishop, and his advances as an investment on September 19, 1949, of $8,000 after he had left the Government service, either alone or in conjunction with a few excerpts of carefully chosen equivocal testimony show that Haynen was a joint venturer with Bishop from the outset.

To satisfy the terms of the bid requirement, Bishop had to put up 1% ($515) in a cashier's check with his bid. He was then seeking employment. He told Haynen that he was going to file a bid but that he did not wish to cash any of his bonds on which he was receiving interest merely to satisfy the bid deposit and before knowing whether the bid would be successful. He therefore asked Haynen if he would loan him sufficient money to make the bid deposit. Haynen made a loan of $515 and took Bishop's promissory note for it. Bishop obtained a check payable to himself from Haynen drawn on Haynen's Dallas bank. Bishop took this check and secured a cashier's check from his bank in Ft. Worth for like amount payable to The United States, and this was submitted with the bid. The Government insists that the mechanics of the handling of this shows there was a furtiveness warranting the inference that it was an illicit contribution of capital, not a loan. We fail to see anything in the mechanics that is unusual. To manifest a bona fide loan, Haynen did not have to go to his bank and obtain a cashier's check payable either to Bishop or the United States. It was customary business usage for Haynen to hand Bishop his check. Nothing about Bishop's own assets offered any basis for inferring that it was not a loan. He was not then employed. His bank balance was running in the neighborhood of $1,000 or so and nothing detracts from

his expressed need to use this for living expenses without losing interest income on his small holding of bonds during the processing of the bid.

That was the sole money coming from Haynen during the time of his employment. Prior to termination of Haynen's employment on September 2, see note 2, supra, the War Assets Administration had formally advised Bishop on August 26, 1949, that his bid had been accepted for the $51,500 less certain agreed credits for personalty retained by the Army. Nothing further remained to be done by any agency of the Government. Neither Haynen nor any other person in the Regional Office had any further responsibility except to handle the mechanics of closing. On September 10, Bishop came to Haynen's home in Dallas. He told Haynen he had been unable to secure the necessary additional financing which had come about from the increase of the down payment from 10% to 20% and sought Haynen's assistance in locating someone who might be interested in helping finance the purchase. After discussing it briefly and going over some of Bishop's notes on the equipment available for sale, Haynen stated that he would be willing to go in with Bishop. On September 19, Haynen, by a written order to his Dallas bank, obtained a cashier's check in the amount of $8,000 payable to Bishop. Bishop deposited this in his own bank at McGregor and obtained from that bank a cashier's check payable to the Government in the sum of $9,163.-43.

Again, the Government sees a spurious motive from these mechanics. We are not told how else it would have been handled, nor is there anything to suggest that this was done in other than a normal business manner. A cashier's check to the United States was needed for $9,163.-43. Part was to come from Bishop's agreed contribution of $2100. Unless two cashier's checks were to be submitted to the Government, which would be unusual, either Haynen or Bishop had to get a single check from one bank. Had Haynen's $8,000 personal uncertified check been deposited in Bishop's account, a cashier's check for $9,163.43 would not have been obtainable, in view of Bishop's usual balance, until Haynen's check cleared. The quickest way to assure a single cashier's check payable to the Government in the correct amount was for Bishop to have Haynen's cashier's or certified check for deposit at his bank. As businessmen both needed a record. Indeed, in this day and time when the tax collector is a necessary constant companion in all that one does or says or thinks, the prudent businessman runs all transactions through his bank account to assure a record, and a failure to do so may bring down the official wrath of the Commissioner as proof of another kind of fraud. Carter v. Campbell, 5 Cir., 1959, 264 F.2d 930; Eagle v. Commissioner, 5 Cir., 1957, 242 F.2d 635, 638.

. Actually had there been an illicit purpose, handling the advance of funds by checks was a clumsy and inept thing. If, in the strong language of the Government's brief, there was a furtive motive, it is more likely that checks would have been cashed and the cash advanced leaving no telltale footprints for the FBI to pick up years later.

The Government insists that these checks gain illicit color from testimony of Haynen. One is a reference to the term "continue" repeated in a series of permissibly leading questions on cross examination concerning the meeting of September 10. Haynen testified "I would continue with him as a partner." The argument obviously is that to *continue* meant that it concerned a relationship previously created. However, within two questions Haynen was asked, "Well, when did you first decide that you were going to start as a partner?" And to this he answered, "At that time," referring to September 10.

The other relates to answers given before the Commissioners. The date, or time, or manner by which he acquired an interest in the profits or the property was not involved in that proceeding. All that F.R.Civ.P. 71A submits to the Commissioner is just compensation, i. e.,

value. Casual reference in that hearing that "we, [Haynen and Bishop] purchased it jointly from the Government" was literally and honorably true. Bishop's bid had been accepted by the Government on August 26, 1949. He was not bound, however, until September 30, 1949, when he made the 20% down payment at which time the deeds were delivered. Haynen, of course, was no longer an employee burdened with the duty of non-dealings with the Government. Behind the equitable principle prohibiting breach of the agent's duty, see note 4, supra, is the factor that the agent must not place himself in the position of determining for his employer whether a particular action is advantageous or disadvantageous. But after September 2 Haynen had no decisions to make for the Government. He could make none. With no decisions to make, or power or right to make them, he had no continuing duty under this equitable doctrine to weigh the Government's interest. We think that the Court's failure to perceive this had a penetrating influence in the finding of breach by Haynen. Admittedly the acts in September were done during terminal leave status, see note 2, supra. The Court seems to have equated employment giving rise to duties with terminal leave status. Consequently, and quite without regard to Haynen's actions prior to September 2, the Court, on this reasoning, was led to find on simple chronology that Haynen acquired an interest during his employment.

When, in point of time, was the property, as Haynen said, "jointly purchased?" One ordinarily purchases when one pays and certainly when one receives delivery. This was long after September 2. Under the circumstances the Court could not read into this or similar loose, and at worst equivocal, references to a joint venture, a partnership in the property, etc., the inferences of a mutual financial interest prior to Haynen's termination on September 2. All that the condemnation commission hearing concerned was value as of the taking in 1954. *When* it was that Haynen obtained his in-

terest was there irrelevant. Indeed, the Government proceeded to treat it as such. At the outset of that hearing, counsel for Bishop formally volunteered on the record information that Haynen had a half interest as a partner of Bishop, and that as a consequence a formal appearance was being entered for Haynen. The Government, in its motion for new trial in the condemnation suit, asserted that the Commission's report erred in finding that "Bill J. Bishop was the owner in fee of each and all of the above named tracts on May 27, 1954, when in truth and in fact Joseph N. Haynen was the owner of a one-half interest in all the properties and his appearance in this cause was entered by [his] attorney of record for Bill J. Bishop and Joseph N. Haynen on the trial of this cause." Then when Haynen filed a formal disclaimer in order to permit the award to be made to Bishop and thus meet the Government's objection, the Government objected to that.

The upshot of this whole record is such that we think a serious error was made and a real injustice has resulted by the Court's finding that Haynen was interested jointly with Bishop. We cannot escape the conviction that this is not the right and justice of this cause. Since our duty is more profound than merely to locate and then isolate pieces of evidence which might permit an inference of illicit dealing as though that were the end of the judicial function somewhat after the manner of the old dispensation amongst some courts in the pre-Universal Camera era, Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, we have had carefully to consider the *whole* of this record. On that look it seems to us in the final analysis there are only two items of proof—the two checks one in June, the other in mid-September. But they become sinister only from these other circumstances so heavily stressed. And those circumstances in turn acquire a sinister color only from the assumption that the June check was a contribution to capital, not a loan. We do not think

that a man's long career as a responsible Government servant can be so quickly wrecked and property commandeered without compensation by any such self-generating mutually interdependent equivocal inferences of wrongdoing.

■ This record shows that the inherent fairness and adequacy of the initial sale to Bishop was independently reviewed and the final decision independently made with extereme caution with no action or non-action by Haynen of any established consequence. It is true that a monetary interest by Haynen would, despite his actual innocence, subject him and his property to the trust. But in a record that does not support a single charge either of a compromise in his duty to exercise his judgment solely in the interests of his master, or the influence of it against the Government's interest, the *fact* of that monetary interest is critical. It must be convincingly established by trustworthy evidence. The total impact on us is that this has not been done and a substantial injustice has occurred. It is our positive duty to reverse findings as clearly erroneous, F.R.C.P. 52(a), in that case. This is so when "the force and effect of the testimony considered as a whole convinces that the finding * * * does not reflect or represent the truth and right of the case," Sanders v. Leech, 5 Cir., 1946, 158 F.2d 486, 487, or when we are "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746. See also United States v. Oregon Medical Society, 1952, 343 U.S. 326, 72

S.Ct. 690, 96 L.Ed. 978. We have repeatedly acknowledged this to be our duty. Slattery Co. v. United States, 5 Cir., 1956, 231 F.2d 37; Reed v. Murphy, 5 Cir., 1956, 232 F.2d 668, 677, certiorari denied, 352 U.S. 831, 77 S.Ct. 45, 1 L.Ed. 2d 51; Galena Oaks Corp. v. Scofield, 5 Cir., 1954, 218 F.2d 217. See 2 Barron & Holtzoff, Federal Practice and Procedure § 1133 (Wright Supp.1958).

The result is that the order setting aside the final judgment of condemnation and award must be reversed and the cause remanded with directions to reinstate that judgment. Likewise, the judgment granting relief sought by the Amended and Supplemental Complaint is reversed and the cause remanded with directions to enter judgment against the Government and in favor of Bishop and Haynen. The Court shall also take such further and consistent action as may be required.

Reversed and remanded.

HUTCHESON, Chief Judge, dissenting.

I am of the *clear opinion*: that the evidence fully and adequately supports the finding and conclusion of the district judge that the defendant Haynen "at the times when a member of the Regional Review Board he participated in the sale of the Bluebonnet property, had a direct financial interest therein as the undisclosed joint venturer with, or partner of, Bishop as a buyer"; that the purchase of the property under those circumstances was in violation of Sec. 489(b) Title 40; [1] and that it subjected the defendants

---

1. "§ 489. Civil remedies and penalties; jurisdiction and venue; additional penalties.

"(a) * * *

"(b) Every person who shall use or engage in, or cause to be used or engaged in, or enter into an agreement, combination, or conspiracy to use or engage in or to cause to be used to engage in, any fraudulent trick, scheme, or device, for the purpose of securing or obtaining, or aiding to secure or obtain, for any person any payment, property, or other benefits from the United States or any Fed-

eral agency in connection with the procurement, transfer, or disposition of property under this chapter, chapter 11B of Title 5, chapter 4 of Title 41, and chapter 11 of Title 44—

"(1) * * *

"(2) * * *

"(3) shall, if the United States shall so elect, restore to the United States the money or property thus secured and obtained and the United States shall retain as liquidated damages any property,

to the obligations imposed by said section. I am, therefore, unable to agree with the result reached by the majority that the order appealed from must be reversed and remanded with directions to enter judgment against the government and in favor of Bishop and Haynen.

I share, however, the view of my colleagues that the evidence does not support the extravagant claims put forward in the brief of the United States, that in the purchase of the property in question, the appellants intended to and did swindle, cheat and defraud the United States out of its fair value. To the extent, therefore, that the findings and conclusions and the judgment went further than to find and conclude that, because and entirely because of Haynen's secret ownership, there was a violation of Subd. (b) Sec. 489, supra, and accountability therefor, and adjudged that the defendants are trustees ex maleficio of the property in suit and "are obliged to account for all of the rents, issues and profits derived from the sale, use, occupation and rental of all of the realty and personalty and shall pay to the plaintiff the total rents, issues and profits derived from the property since September 30, 1949, and interest thereon", the findings and conclusions and the judgment went beyond the facts and the law.

While, therefore, I must dissent from the opinion of the majority and the judgment ordered by them, I am of the view that the judgment appealed from should be modified by striking from it the provisions above quoted and, as modified, should be affirmed.

On Petition for Rehearing

PER CURIAM.

As neither of the judges who concurred in the opinion is of the view that the petition for rehearing should be granted, it is ordered that the same be and is hereby denied.

money, or other consideration given to the United States or any Federal agency

for such money or property, as the case may be."